577 P.2d 1135

**The STATE of Idaho,**
**Plaintiff-Respondent,**

v.

**Delbert CRAWFORD,**
**Defendant-Appellant.**

**No. 11909.**

Supreme Court of Idaho.

April 3, 1978.

Rehearing Denied May 17, 1978.

---

Victor J. Rolzitto, Ketchum, for defendant-appellant.

Wayne L. Kidwell, Atty. Gen., Gordon S. Nielson, Sr. Deputy Atty. Gen., Boise, for plaintiff-respondent.

BAKES, Justice.

The defendant appellant Delbert Crawford was tried on an information charging him with the crimes of first degree murder of Paul Peterson and Greg Solosabal, and robbery of Randi Solosabal, the wife of Greg Solosabal. The jury returned verdicts finding the defendant guilty of two counts of second degree murder and one count of robbery. Judgment was entered upon the verdicts, from which the defendant has appealed. These charges arise under the following circumstances.

I

Paul Peterson was a resident of a rented house at 1528 Almo Street in Burley, Idaho. During the autumn of 1974, he had allowed his friends Greg and Randi Solosabal, husband and wife, to park their van, which served as their home, at his residence. During that time Paul and Greg were both frequent users of drugs, including heroin, and dealers in drugs, principally heroin. In the early evening hours of November 7, 1974, Gaye Billingsley, another Burley resident, went to the home of Val Solosabal, Greg's half brother, to borrow a shotgun. Kenneth Goldberg, a friend of Val's who was staying at the house and who was the only person there, lent her the shotgun and three shells. When she returned home, her husband Terry Billingsley took the shotgun and the shells from her, and he and the defendant Delbert Crawford left the Billingsleys' house together, taking the shotgun and shells with them.

That same evening Paul, Greg and Randi, and their daughter were at Paul's house on Almo Street. Paul and Greg were preparing to inject themselves with heroin when two men came to the door. Greg Solosabal, who answered the door, announced, "Terry is here." The first man to enter was tall and blond and carried a shotgun; the other

was short and dark haired. Moments later a brief argument ensued concerning money and drugs; Paul and Greg were then each shot once by the tall blond man who held the shotgun. After the two men removed Paul's and Greg's wallets from their bodies, the blond man demanded Randi's money. She gave him the $20 she had in her purse; then the two men left the home. After the two men left, Randi telephoned for emergency aid. However, Paul and Greg both died before any emergency medical aid could reach them. Randi gave the police officers who were investigating the shootings a statement describing the men who had come to the house. In her statement, she identified the tall blond man as Terry Billingsley, but it is unclear whether she identified the dark haired man as Deb Crawford or police officers told her that they believed the other man was named Deb Crawford.

The emergency vehicles which answered the call at the Almo Street residence brought a considerable amount of attention to the area. LeeAnn Anderson, who was acquainted with Paul Peterson, Greg and Randi Solosabal, Terry and Gaye Billingsley, and Delbert and Linda Crawford (who are husband and wife), saw the police cars and ambulances in the area. She drove to the Billingsleys' home to tell the Billingsleys and the Crawfords (whom she knew had been staying with the Billingsleys) about the commotion near Paul's house on Almo Street, but returned to the vicinity of Paul's house when she found no one at the Billingsleys' home. Anderson continued driving around the area until she was finally stopped by a police officer for questioning. According to Anderson's testimony at a suppression hearing, an officer told her that Paul and Greg were dead and that Terry Billingsley was a suspect. Anderson then told the police that Terry and the defendant Delbert Crawford had been displeased with Paul and Greg over drug dealings and that Terry and the defendant had been talking about "ripping them off" to get even and to allow the defendant to

obtain money with which he and his wife Linda would go to Arizona. Anderson also gave the police a description of Terry's car. The Burley police put out an all points bulletin on the car.

In the meantime, the Billingsleys and Crawfords had left Burley, pausing on their way out of town to allow Gaye Billingsley to return the shotgun she had borrowed to Kenneth Goldberg. She did not return any of the shells that she had borrowed. The four then drove to Pocatello in the Billingsleys' car. As they were eating at a restaurant-truck stop, a Pocatello police officer became suspicious of them because one of them fit the description of a suspect in a murder that had recently occurred in Pocatello. The officer made a radio check on Terry Billingsley's car and license plates and was informed that the owner of the car was wanted in connection with the shootings in Burley. He was told to arrest the occupants of the car. The officer called for reinforcements and the arrest was made some minutes later after the four had left the restaurant. When the four were later searched incident to their arrest and confinement in the Bannock County jail, the search revealed that the defendant had $513.91 in his possession and that Gaye Billingsley had $469.44.

The following day, November 8, 1974, a complaint was filed in the magistrates division of the district court of Cassia County. The complaint charged the defendant and Terry and Gaye Billingsley with the murders of Paul Peterson and Greg Solosabal, and the defendant and Terry Billingsley with the robbery of Randi Solosabal. According to the complaint, Terry Billingsley shot the decedents with a shotgun while acting in concert with Gaye Billingsley and the defendant. Thirteen days later, November 21, 1974, the criminal complaint was amended charging the defendant, rather than Terry Billingsley, with being the person who discharged the shotgun, killing the two decedents. There were no further amendments to the criminal complaint.

At the preliminary hearing the state was represented by the then Cassia County prosecuting attorney, Gordon Nielson. The defendant was represented by appointed counsel, Alfred Barrus. The Billingsleys each had separate counsel. The magistrate before whom the preliminary hearing was held found that there was probable cause to bind the defendants over for trial on all counts. An information was then filed against the defendant and the Billingsleys charging all three of them with two counts of first degree murder and the defendant and Terry Billingsley with one count of robbery. The three were bound over to the district court for trial.

After the preliminary hearing, but before any proceedings were conducted in the district court, Gordon Nielson resigned as prosecutor of Cassia County to accept a position as Deputy Attorney General. Alfred Barrus, who had represented the defendant at the preliminary hearing, was appointed Cassia County prosecutor to fill the vacancy created by Nielson's resignation. Victor Rolzitto was then appointed to represent the defendant. He represented the defendant through the preliminary motions and through trial and has continued to represent him upon this appeal. Barrus, meanwhile, disqualified himself from prosecuting the case and asked the Attorney General's office to appoint a special prosecutor. The Attorney General's office appointed Nielson. Nielson represented the state at the pretrial hearings and at trial and has also represented the state upon this appeal.

The defendant filed numerous pretrial motions. Included, among others, were motions to disqualify the special prosecutor, to suppress Randi Solosabal's identification of the defendant, to suppress and return the money seized from him at his arrest, to permit him to inspect the state's physical evidence and to make scientific tests, to discover copies of any scientific reports prepared by the state, to discover the names and addresses of witnesses whom the state might call at trial, to allow him to have a haircut and acquire appropriate attire for trial, to permit him to appear in court for trial without physical restraints such as chains and manacles, and to provide trial

counsel with daily transcripts of the trial proceedings.

The trial court granted the discovery motions in part. It denied the defendant discovery of the addresses of the state's witnesses LeeAnn Anderson and Randi Solosabal on the ground that anonymous threats had been made against them, and their personal safety required that their addresses not be revealed. The district court granted the defendant's request to use state testing facilities to perform tests on the defendant's evidence, but denied a request to perform tests upon the state's evidence, regardless of whether the state intended to use the evidence at trial. The district court also denied the defendant's motions to suppress and return the money seized from him upon his arrest, to disqualify the special prosecutor, to suppress Randi Solosabal's identification, and to provide daily transcripts of trial. The district court granted the motion that the defendant not be required to wear prison attire and that he not be restrained by means of chains or manacles in the presence of the jury. The last order, dated January 14, 1975, was made subject to further order of the court in the case of exceptional circumstances.

Following this initial round of motions, the defendant made further motions for discovery of statements made by prosecution witnesses, to dismiss on the grounds that court order had prevented the defendant's attorney from interviewing prosecution witnesses, and again to suppress the identification by Randi Solosabal, testimony by LeeAnn Anderson that may have led to his arrest, the money seized from him following his arrest, and all other evidence which was the result of his identification and arrest. The court denied all of these motions, but pointed out that an earlier order regarding publicity had not prevented the defense attorney from interviewing prosecution witnesses and was not intended to do so.

The jury selection phase of the trial was scheduled to begin on Monday, March 10, 1975. On March 5, 1975, Terry and Gaye Billingsley pleaded guilty to reduced charges as the result of a plea bargain between the special prosecutor and their counsel. Terry pleaded guilty to two counts of accessory after the fact to first degree murder and one count of armed robbery, while Gaye pleaded guilty to "robbery and accessory after the fact of murder." [1]

On this same day, the special prosecutor, without notice to or the presence of the defendant or his attorney, met with the district judge in chambers regarding the district court's earlier order that the defendant not be chained or manacled or otherwise bound in the presence of the jury. Terry Billingsley appeared before the judge at that meeting in chambers to relate that the defendant had made threats of escape and violence while in jail. Based upon this hearing, upon a previous communication from the sheriff's office to the district court concerning the defendant's threats to escape, and upon the Billingsleys' fears for their safety and the safety of their children at the hands of the defendant or his friends, the district court rescinded its earlier order and entered an order that the defendant be restrained during the course of trial. This order was signed on March 6, and entered on March 7, a Friday. Jury selection was to begin the following Monday.

Before jury selection began on Monday, March 10, the district court admonished the prospective jurors that the defendant's physical restraints were not evidence of guilt and that no member of the jury panel should permit himself or herself to consider the restraints as evidence against the defendant. Jury selection continued throughout the rest of that week. The following

1. It is unclear from the record exactly what were the charges to which Gaye Billingsley pleaded guilty. Her description of the charges, which is quoted above, does not agree with the charges listed against her in the information. It is possible that her testimony was mistaken because she had never been charged with robbery in the information; perhaps she meant to say that she pleaded guilty both to accessory after the fact for robbery and to accessory after the fact for murder.

Monday, March 17, before trial was to begin, the defendant's attorney moved for a mistrial on the ground that "armed guards inside the courtroom and manacles and handcuffs on the defendant . . . portray a poor picture of the defendant and prejudice his chances for a fair trial." The trial court denied this motion. For the duration of the trial, the defendant continued to be restrained, although for the last days of trial his handcuffs were removed and he was only manacled by leg irons. The record is unclear whether armed guards continued to be present in the courtroom for the rest of trial.

At trial Randi Solosabal testified to the following effect. On the night of the shootings a tall blond man and a short dark haired man came to the house on Almo Street. The tall blond man, whom she initially identified as Terry Billingsley but later learned was named Delbert Crawford, carried a shotgun. After a brief argument in the kitchen, the tall man, whom at trial she identified as the defendant Crawford, shot Greg Solosabal and Paul Peterson; he and the shorter man then removed the decedents' wallets from their bodies. After that, the defendant demanded all the money that she had. She gave him the $20 in her purse. The two men then left.

Terry Billingsley testified at trial that he and the defendant had taken the shotgun which Gaye Billingsley had borrowed and proceeded to the Almo Street house. Billingsley testified that after entering the house the defendant demanded of Paul and Greg "their dope and their money," then shot them. Billingsley stated that he and the defendant had taken the money that Greg and Paul had in their wallets.

Gaye Billingsley testified that when her husband and the defendant returned to the Billingsleys' home after their brief absence, she and Linda Crawford were told they were going to leave town. Gaye returned the borrowed shotgun; then the four drove to Pocatello. While en route the defendant had counted out $469 and given it to Gaye, telling her that he and Terry had killed Paul and Greg and had taken the money from them.

The defendant by his assignments of error has raised numerous issues concerning the propriety of the rulings of the trial court in the pretrial and trial proceedings. However, the first issue is dispositive of this appeal.

II

The defendant alleges that the order of the court requiring him to be restrained by manacles and chains in front of the jury violated his constitutional right to the presumption of innocence and a fair trial. He further argues that the procedure employed by the court in entering the order imposing the restraints violated his constitutional right to due process because these restraints had been imposed by the district court as the result of an *ex parte* hearing between the district court and the prosecutor after the court had originally ruled otherwise.

We will consider the procedural aspect of this issue first.

A. Neither the defendant nor his attorney had been notified of this hearing and neither attended, nor was either given any opportunity before trial to suggest a system of physical restraint not apparent to the jury. No transcript of that hearing was made available to the defendant or his attorney until the record before this Court was augmented after oral argument. This Court has most recently considered questions concerning the trial of a manacled or shackled defendant in the case of *State v. Moen*, 94 Idaho 477, 491 P.2d 858 (1971). In that case, which also involved a jury trial, the Court said the following:

"The appellants' first contention is that they were denied a fair and impartial trial because they were forced to wear handcuffs at trial. . . . The law applicable to the issue raised by the appellants is concisely summarized in 23 C.J.S. Criminal Law § 977 (1961):

'During the trial accused should, as a general rule, be free from shackles, except in so far as the trial court, in its

sound discretion, deems them necessary to prevent the escape of accused or his forcible release, to restrain him from doing violence to others, or from injuring himself, or to prevent such misconduct as would obstruct the work of the court; and such exceptions apply particularly while accused is being brought into or taken from court. *If accused is shackled without such necessity, it is reversible error,* unless it is clear that no prejudice in the minds of the jury was caused thereby.'

"Furthermore, when reasonable precautions are taken to retain custody of the accused, the fact that they indicate to the jury that the defendant is a prisoner and perhaps a dangerous character does not deprive him of a fair trial. (Citations omitted).

"Although the sheriff has some initial responsibility for determining whether an accused should be handcuffed during a jury trial, the trial judge must, in fulfilling his duty to preside over the trial, decide the question for himself. (Citations omitted). In exercising his discretion, the judge need not rely only upon evidence formally offered and admitted at trial. His knowledge may properly stem from official records or what law enforcement officers have told him. *State v. McKay* [63 Nev. 118, 165 P.2d 389 (1946)]. . . . *However, the information relied upon should be shown on the record before trial and out of the presence of the jury, and the defendant should be afforded reasonable opportunity to meet that information. This will provide a record on which an appellate court can determine whether the trial judge has properly exercised his discretion—i. e., whether there were reasonable grounds for apprehension as to defendant's conduct.* (Citations omitted). If defense counsel desires to object to the defendant's being brought before the court in handcuffs, he should do so before the jurors arrive or after requesting that the court excuse them. The entire matter should then be aired by a hearing, on the record, so as to enable the judge to make his determination out of the presence of the jury and to state the reasons for his decision for the appellate court." 94 Idaho at 479–80, 491 P.2d at 860–61 (emphasis added).

In this case the procedures outlined in *Moen* were not followed. The trial court had originally granted the defendant's motion that he be tried without physical restraints. Then, based upon motion of the special prosecutor in an *ex parte* hearing which neither the defendant nor his counsel was given notice of or an opportunity to attend,[2] the trial court rescinded its earlier order. Neither the defendant nor his attorney had any opportunity before the prospective jurors saw him manacled and shackled to contest the order that the defendant be restrained. This order was filed in the district court on the Friday before the Monday that jury selection was to begin. Defense counsel informed this Court at oral argument that he had not received the order before he arrived to begin jury selection and thus had no opportunity to contest it or seek less restrictive alternatives. Indeed, because of the earlier order,

**2.** The Code of Professional Responsibility provides the following with regard to *ex parte* contacts with judges:

"DR 7–110 Contact with Officials.

. . . . .

"(B) In an adversary proceeding, a lawyer shall not communicate . . . as to the merits of the cause with a judge or an official before whom the proceeding is pending, except:

. . . . .

(3) Orally upon adequate notice to opposing counsel or to the adverse party if he is not represented by a lawyer.

. . . ."

Canon 17 of the Judicial Ethics in effect at the time of the hearing (these canons were rescinded effective January 1, 1977, and replaced by new canons on that date) provided that "a judge should not permit private interviews, arguments or communications designed to influence his judicial action, where the interests to be affected were not represented before him, except in cases where provision is made by law for *ex parte* application."

the defense had arrived at this phase of trial assuming the defendant would not be physically restrained. Instead, from the beginning of jury selection, the defendant was shackled and chained and accompanied by armed guards, all of which was both visible to the jury and called to their attention by the trial court, which instructed them not to consider the restraints as evidence against the defendant. Before the evidence commenced, defendant's attorney moved for a mistrial on the ground that the restraint of the defendant by manacles and chains and the presence of armed guards in the courtroom, all of which were visible to the jury, prejudiced the defendant's right to a fair trial. The trial court denied the motion.

▆▆ The procedure followed by the trial court in conducting an *ex parte* proceeding in which the vitally important decision was made to shackle the defendant violated the procedural rights of the defendant guaranteed by both the state and federal Constitutions. In *Moen* we said that "the information relied upon should be shown on the record before trial . . . and the defendant should be afforded reasonable opportunity to meet that information." 94 Idaho at 479–80, 491 P.2d at 860–61. This requirement stems directly from Art. 1, § 13, of the Idaho Constitution, which requires both a "public trial," not an *ex parte* trial in chambers, and a trial in which the defendant has the right "to appear and defend in person and with counsel." Indeed, the right of the defendant to be present at all significant stages of a criminal proceeding is universally accepted in the Anglo-American system of justice. The essence of due process "includes a right of both defendants and their counsel to be present at all stages of the trial from arraignment to verdict and discharge of the jury" if "absence could, under some set of circumstances, be harmful." *Polizzi v. United States*, 550 F.2d 1133, 1137–38 (9th Cir. 1976). I.C. § 19–106 also guarantees to

a defendant "in a criminal action" the right "to appear and defend in person and with counsel." Where, as here, an *ex parte* proceeding was held by the court in chambers, a witness was produced and evidence taken by the court, and a prior order of the court was reversed and a new order entered, the defendant's statutory and constitutional rights to a public trial and to be present at all significant stages of the criminal action have been violated.[3]

B. In addition to the procedural due process violations described in Part A, the defendant was denied his right to a fair trial because the adverse effect which the physical restraints had upon the presumption of innocence "might have affected the outcome of the trial." *U. S. v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976); *State v. Buss*, 98 Idaho 173, 175, 560 P.2d 495, 497 (1977) (Bakes, J., concurring specially). In *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), the Supreme Court of the United States said the following with regard to trying a defendant while he was wearing prison clothing:

"The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. *Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103, 113 (1975). The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice. . . .

"To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368, 375 (1970).

---

3. In the record at the *ex parte* proceeding, the trial court, recognizing that the defendant ought to have some input into the proceeding, attempted to perform that function himself by noting in his March 6, 1976, order that "pre-

sumably Defendant Crawford would deny the threats and they are deemed denied by him." However, the Constitutions and the statutes reserve the right to the defendant and his counsel, not the court on his behalf.

"The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny. *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." 425 U.S. at 503–04, 96 S.Ct. at 1692–93.

The Court went on to state that trying an accused in prison clothing over his objection violated the due process clause of the Fourteenth Amendment, apparently because of the potential prejudicial impact of indicating to the jury that the defendant was ineligible to be released from jail pending trial.[4]

The case at bar involves a practice having an even more adverse effect upon the presumption of innocence than the situation in *Estelle*. In *Moen* this Court clearly recognized the potential prejudicial effect of trying defendants while they were restrained in the presence of the jury. If defendants are tried while restrained—and it is clear that they may be, *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *State v. Moen*, 94 Idaho 477, 491 P.2d 858 (1971)—it is not because the restraint is less prejudicial for some defendants than others, but it is because overriding concerns for safety or judicial decorum predominate. Indeed, I.C. § 19–108 expressly prohibits "any more restraint than is necessary for his detention to answer the charge." But we cannot tell whether there were such overriding concerns in this case or whether the restraint was excessive, because the defendant was given no opportunity to meet the statements made against him, or to suggest oth-

er less obvious alternatives, contrary to our express direction in *Moen*, that "the information relied upon should be shown on the record . . . and the defendant should be afforded a reasonable opportunity to meet that information." 94 Idaho at 479–80, 491 P.2d at 860–61. The procedure outlined in *Moen* is required in other state and federal courts as shown by the following statements:

"In the courtroom, guards should remain outside the observation of the jury, and should deliver the defendant to the counsel table before the jury's arrival if necessary; manacles, shackles and other physical restraints are, of course, to be avoided. Deviation from these standards is justified only to protect the safety and decorum of the court, to prevent a threatened escape, or to respond to some other manifest necessity. Such measures should be taken only after the defendant has been given an opportunity for a hearing, and the restraints imposed should be the least intrusive which will accomplish the desired result." *Anthony v. State*, 521 P.2d 486, 496 (Alaska 1974).

"While the cases have laid down no definite rule as to the exact form for an evidentiary hearing to determine whether physical restraint is necessary, we think that it is preferable, except in cases where the trial process is disrupted in the court's presence, that a formal hearing should be conducted with sworn testimony. In this way factual disputes may be resolved and a meaningful record preserved for an appeal or for collateral relief." *Kennedy v. Cardwell*, 487 F.2d 101, 110 (6th Cir. 1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974).

"Whenever unusual visible security measures in jury cases are to be employed, we will require the district judge to state for the record, out of the presence of the jury, the reasons therefor and give counsel an opportunity to comment thereon,

---

4. However, the Supreme Court in *Estelle* did not reverse the conviction because the defendant had proceeded through the trial without objecting to being tried in prison garb. How-

ever, here the defendant Crawford objected when he learned that the trial court had changed its position and had ordered him restrained during the trial.

as well as to persuade him that such measures are unnecessary. In that manner we will be enabled readily to determine if there has been an abuse of discretion. We will not require the formal taking of evidence on the subject in the usual case, but a district judge may conclude to take evidence and making findings if the factual need for extraordinary security is controverted." *United States v. Samuel*, 431 F.2d 610, 615 (4th Cir. 1970). *Accord, United States v. Theriault*, 531 F.2d 281 (5th Cir. 1976), *cert. denied*, 429 U.S. 898, 97 S.Ct. 262, 50 L.Ed.2d 182 (1976).

The conclusions of the American Bar Association Project on Minimum Standards for Criminal Justice echo the same concerns as the foregoing cases:

"If the trial judge allows physical restraints to be used, he must state for the record the basis of his decision in this regard, and the record must also support the trial judge's conclusions, either by way of the individual's conduct during trial or by way of evidence adduced out of the presence of the jury on the question of physical restraint. *People v. Mendola*, 2 N.Y.2d 270, 159 N.Y.S.2d 473, 140 N.E.2d 353 (1957); *DeWolf v. State*, 96 Okla.Crim. 382, 256 P.2d 191 (1953). For an illustration of such a hearing, see *People v. Bryant*, 5 Misc.2d 446, 166 N.Y.S.2d 59 (1957). The hearing, although informal, makes it possible for the alleged facts justifying restraint to be made a matter of record and to be challenged by the party aggrieved.

"Some courts would not allow restraints on the basis of evidence received at a hearing, as they limit the use of restraints to instances where they are called for by the conduct of the person in the courtroom. This view is rejected here, for 'if the trial judge is compelled to wait until the defendant has committed violent or disruptive acts at the trial, it may very well be too late to protect the safety of the court and the dignity of the proceedings.' Note, 8 St. Louis L.J. 401, 402 (1964)." American Bar Association, Standards Relating to Trial by Jury

§ 4.1(c), commentary at 96–97 (Approved Draft, 1968).

Moreover, even if the district judge had been justified in ordering the defendant to be restrained to prevent escape or for the safety of those in the courtroom, that does not mean that the methods of restraint selected were not prejudicial. Neither the defendant nor his attorney were notified of or attended the hearing at which the district court decided that restraints were to be imposed. Thus, the defendant had no opportunity to suggest that the restraints to be used should be of the kind used by the trial court in *Loux v. United States*, 389 F.2d 911 (9th Cir. 1968). In that case the trial judge had been informed that the defendants might attempt to escape during the trial.

"He therefore held a rather extensive hearing on the question of whether the defendants should be shackled during the trial. He ultimately decided that they should, and they were. The shackles consisted of leg irons, handcuffs and a belt to which the shackles were attached by chains. The defendants could walk and move their hands, but their movements were limited. Efforts were made to make this situation as inconspicuous as possible. The defendants were brought in and seated behind a table before the jury came in. The jury did not see them escorted in or out." 389 F.2d at 919.

As the foregoing case clearly shows, some restraints can be imposed upon a criminal defendant without making those restraints visible to the jury. Had the defendant or his attorney been present at the hearing in which the trial court decided to impose the physical restraints, or had the hearing been delayed until the Monday morning that jury selection was to begin, they could have suggested the following alternatives so that the jury would be unaware that the defendant was restrained. The defendant could have always been present and seated at the defense table before the jury came in and after it left to conceal the fact that his legs were in irons. He could have been clothed with a jacket if this would have concealed

belts or chains. It may have been possible to insure the safety of those present in the courtroom by chaining the defendant's legs to table legs, radiator pipes, railings or other firmly anchored objects, but concealing this from the jury. But the defendant had no opportunity to suggest these alternatives because he was not party to the hearing at which the district court decided to restrain him.

■ Finally, we note that the lines between the different degrees of homicide are not ordinarily drawn in terms of easily observable acts of the accused, but instead turn upon mental states such as intent, deliberation, provocation or passion. The jury's interpretation of the evidence bearing upon such mental states ordinarily is subjective. In a case such as this, then, the court must be particularly sensitive to factors which may influence the jury's subjective assessment of the defendant. Whether a defendant shall be restrained in a manner visible to the jury is certainly a factor which the trial court must consider, and an issue upon which the defendant and his counsel are entitled to be heard.

■ We hold, therefore, that under the circumstances of this case, where the district court had originally ordered that the defendant stand trial without physical restraints, but then rescinded the order based upon information obtained in a hearing which neither the defendant nor his counsel were advised of or attended, where neither the defendant nor his attorney had any opportunity to contest the order or suggest a less visible means of restraint before the defendant was first exposed to the jury, and where timely objection to the restraints was made, the defendant's rights to a fair trial and "to appear and defend in person and with counsel," guaranteed by the due process clauses of Art. 1, § 13, of the Idaho Constitution, and the Fourteenth Amendment to the Constitution of the United States, were violated, and he is entitled to a new trial. On remand, if the prosecution again wishes to move the district court to restrain the defendant during trial, the defendant or his attorney must be allowed to attend that hearing, to meet the information upon which the necessity for restraint is based, and to suggest means of restraint which are not visible to the jury if the district court finds that restraint is necessary. While we cannot say whether the district court must find that the defendant should or should not be restrained upon retrial, we hold that any restraint must be based upon a finding of the necessity for that restraint. Furthermore, if the defendant or his counsel suggest forms of restraint which will conceal the restraint from the jury, the district court must consider these suggestions and, if it rejects them, state why it is necessary to impose forms of restraint which are visible to the jury or more clearly visible than others.

■ C. The defendant further claims that his presumption of innocence was adversely affected because a witness that he called, who was in jail at the time, was also brought into the courtroom before the jury in manacles. The authorities generally recognize that the same considerations which apply to the restraint of a defendant apply to the restraint of the defendant's witnesses.

"The reasoning behind the rule is that physical bonds may create prejudice in the minds of the jury against one so restrained and may confuse or embarrass the mental faculties of the restrained party. Annot., 75 A.L.R.2d 762 (1961). On this reasoning, the rule has also been applied to witnesses for the defendant, *ibid.* and similar analysis supports the view that ordinarily there should not be an excessive show of force through the attendance at the trial of a great many law enforcement officers, e. g., *People v. Harris*, 98 Cal.App.2d 662, 220 P.2d 812 (1950).

"The standard applies to *all* defendants and witnesses, for the rationale of the rule, as stated above, applies to all such persons. Because the rule rests only in part upon the possibility of jury prejudice, it should not be limited to jury trials. The restraint in question includes shackles (which would encompass all

forms of handcuffs, leg irons, restraining belts, and the like), a gag (sometimes employed when the defendant has seriously disrupted the proceedings, *e. g.*, *United States v. Bentvena,* 319 F.2d 916 [2d Cir. 1963]), and the presence of many law enforcement officers. Existing law on the latter form of restraint is somewhat ambiguous, but it would seem that a showing of need should be required whenever custodial officials have decided to subject a particular defendant or witness to a guard beyond that customarily employed.

"The standard applies while the witness or defendant is 'in court'; custodial officials should be free to employ added restraints while transporting the incarcerated person to and from court." American Bar Association, Standards Relating to Trial by Jury § 4.1(c), commentary at 94 (Approved Draft, 1968) (emphasis in original).

On retrial the court should take the necessary steps to avoid the restraint of witnesses before the jury, unless it finds that restraint in fact is necessary. Then the same precautions described above with regard to defendant to avoid jury detection of the restraints should be employed.

### III

The defendant also argues that his due process rights to a fair trial were prejudiced because the court denied his motion for discovery of statements made by prosecution witnesses filed on January 28, 1975. The court ruled on February 15, 1975, approximately three weeks before the commencement of the trial, that "under Rule 16 of I.C.R. the defense is not entitled to these statements, at least at this stage." In the statement, Randi Solosabal said, among other things, that her husband Greg had grabbed the shotgun when the discussion with the defendant became heated. At trial Randi denied that Greg had actually grabbed the gun prior to its discharge, contrary to the statement which she had given to the police. The defendant argues that he was prejudiced by the prosecution's fail-

ure to reveal this statement to him until midway through the trial because he could not properly prepare his case to show that the shooting may have been accidental or reflexive in response to an aggressive move by Greg Solosabal. The defendant has pointed out that the trial court denied his request to subject the shotgun to scientific ballistic and finger print tests and that such tests may have confirmed that the decedent Greg Solosabal did in fact grab the barrel of the gun prior to the shooting.

We need not now decide whether the trial court's denial of the motion for discovery of the prosecution witness's statement was error, or, despite the trial court's ruling, whether or not the prosecution had an affirmative duty to disclose that statement to the defense, as arguably exculpatory of the defendant, because this case is being remanded for a new trial on other grounds. However, in the recent case of *State v. Brown,* 98 Idaho 209, 560 P.2d 880 (1977), we considered a similar question. In that case the prosecution did not turn over a statement it had taken from the defendant's alibi witness when requested to do so. We held, based upon the decisions of the United States Supreme Court in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that the defense is entitled to discovery of statements made by witnesses or potential witnesses when there is a substantial basis for claiming materiality of the statement in preparing for or conducting the defense, 98 Idaho at 212–13, 560 P.2d at 883–84, and that the proper test to determine whether failure to turn over such a statement is grounds for a new trial is whether the evidence which the statement disclosed might have affected the outcome of trial, *id.* at 213, 560 P.2d at 884. Had the prosecution disclosed Randi Solosabal's statement that her husband had grabbed the shotgun before it discharged, the trial court would have better appreciated the significance of the defendant's request to examine the gun for finger prints, and thus another error at trial might have been averted. On retrial, the prosecution must

comply with discovery requests according to the following rule set forth in *Agurs,* which we quoted in *Brown:*

> " '. . . [I]f the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.' 427 U.S. at 106, 96 S.Ct. at 2399." 98 Idaho at 212–13, 560 P.2d at 883–84.

## IV

Since this matter must be remanded for a new trial there are several other questions of law raised by the defendant's assignments of error which will arise on retrial and which should be resolved at this time. I.C. § 1–205. The defendant contends that his, his wife's, and the Billingsleys' arrest in Pocatello was illegal and that evidence seized from them pursuant to that arrest should have been suppressed. He also contends that Randi Solosabal's identification of him at trial was the result of a prejudicial, illegal photo lineup and that her identification of him should have been suppressed.

A. *The legality of the arrest.* The defendant argues that the evidence seized at the time that he and the others were arrested in Pocatello should have been suppressed because there was no probable cause for their arrest at that time. His assignment is based on the following rationale: (1) the Pocatello policemen who arrested him did so on the basis of a radio dispatch from the Burley police department; (2) the all points bulletin broadcast by the Burley police dispatcher was not based upon Randi Solosabal's statement that Terry Billingsley had killed Greg and Paul, but was instead based upon LeeAnn Anderson's statements to Burley policemen; and (3) because LeeAnn Anderson's statements did not establish probable cause for arrest, the arrest ultimately based upon those statements was

illegal and the evidence seized in the arrest inadmissible. We shall consider these points in turn.

■ I.C. § 19–603(3) provides that a peace officer may make an arrest without a warrant when a felony has in fact been committed and he has reasonable cause to believe that the arrestee has committed it. This Court has interpreted the statute to authorize an arrest based upon a request from other police officers if the requesting officers have probable cause to believe that the person arrested has committed a felony. *State v. Polson,* 81 Idaho 147, 339 P.2d 510 (1959). But under the Fourth and Fourteenth Amendments to the Constitution of the United States a warrantless arrest based upon a request from a fellow police officer is legal only if the officers initially requesting the arrest had probable cause to believe that the arrestee had committed a crime. *Whiteley v. Warden, Wyoming State Penitentiary,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). *See State v. Deschamps,* 94 Idaho 612, 495 P.2d 18 (1971), *cert. denied,* 405 U.S. 1040, 92 S.Ct. 1310, 31 L.Ed.2d 581 (1972). Thus, it is clear that the Crawfords' and Billingsleys' arrest was legal only if an officer with probable cause to believe that they had committed a crime had initiated the communication within the Burley Police Department which ultimately led to the broadcast of the all points bulletin. We must determine whether there is evidence in the record to support the district court's implicit finding to that effect.

■ A number of policemen arrived at the Almo Street residence within the first hour or two after Randi Solosabal called for emergency aid. The first officer to arrive was an undercover drug officer. Randi testified that because of his personal appearance, she thought that he was probably a friend of the two men who had killed her husband and Paul Peterson returning to kill her. Because of her fears, she did not think she responded to his question, "Who did it?" But the undercover officer testified that she had answered and told him that Terry Billingsley had done it. Randi was certain

in her testimony, however, that she later told Officer Frank Segovia that Terry Billingsley had been responsible for the shootings. She did not remember telling any other officer that. But at the time she was talking to Officer Segovia, other officers were in the house. One of the officers, Charles Harkness, testified that he had overheard Randi tell the undercover officer (rather than Officer Segovia) that Terry Billingsley had done it. Thus, it is apparent that there was evidence from which the district court could have found that several Burley police officers, in addition to Officer Segovia, had heard Randi state that Terry Billingsley was responsible for the shootings. Although it is not clear how this information was relayed from the officers investigating the crime at Almo Street to the Burley police radio dispatcher (in particular, Officer Segovia did not remember immediately telling other officers that Randi told him that Terry Billingsley had done it), we do not think it is necessary to reconstruct a chain of transmission of information from one officer to another in order to show that the police official responsible for broadcasting the all points bulletin had probable cause to believe that Terry Billingsley was guilty of a crime. A reasonable inference which the district court could draw from the evidence presented at the suppression hearing was that the information Randi Solosabal gave the officers who arrived at the Almo Street residence was transmitted through regular channels to the Burley police radio dispatcher and then put on the air. The fact that the Burley police were unable to establish with certainty the exact chain by which this information was passed from officer to officer does not mean that the finder of fact could not make an inference that Randi's statement that "Terry Billingsley did it" was the basis for the broadcast of the all points bulletin.

The defendant disagrees with this analysis for several reasons. He argues that the evidence was clear that the all points bulletin was based upon information the police received from LeeAnn Anderson, not upon that given by Randi Solosabal. He further argues that the statements LeeAnn Anderson gave the police did not establish probable cause for arrest and therefore the arrest of the Crawfords and Billingsleys was illegal. We disagree.

■ There was a conflict in the testimony at the suppression hearing concerning what happened when the police stopped LeeAnn Anderson for questioning. Anderson testified that an officer told her that Paul Peterson and Greg Solosabal were dead and that they believed that Terry Billingsley was responsible. The officer who stopped her, however, did not think that he had told her that Terry Billingsley was a suspect. Instead, he testified that after he described the circumstances of the crime to her, she had responded, "It sound[s] like Terry and Deb." In any event, both Anderson's and the officer's testimony agreed that in the ensuing questioning Anderson told the police that in the week before the shootings she had spent considerable time in the Billingsleys' and the Crawfords' company, that Terry and the defendant had had disagreements with Paul and Greg concerning past drug dealings, that Terry and the defendant knew that Paul and Greg would obtain a great deal of money when they cashed their paychecks that week, that the defendant needed money because he and his wife were planning to leave for Arizona, and that Terry and the defendant, and in particular the defendant, had been talking of "ripping them [Paul and Greg] off." Based upon all this information—Terry Billingsley's and the defendant's disagreements with Paul and Greg, their knowledge that Paul and Greg would be paid that week, and their stated intentions to "rip [the decedents] off"—coupled with the facts that the crime committed seemed to be the same type of crime that Terry and the defendant had stated their intentions to commit and that the Billingsleys and the Crawfords were not to be found in Burley, we think the Burley police had probable cause to arrest Terry Billingsley and the defendant based solely upon LeeAnn Anderson's information. Therefore, even if the all points bulletin had not been based upon Randi Solosabal's statement to police

officers that "Terry Billingsley did it," nevertheless the Burley police department had probable cause for broadcasting the all points bulletin based upon Anderson's statements to the officers. Accordingly, none of the evidence seized from the Billingsleys or the Crawfords at the time of their arrest should have been suppressed as the fruits of an illegal arrest and all evidence seized at their arrest may be re-introduced at retrial.

B. *Randi Solosabal's identification and the photo lineup.* Randi Solosabal had never met Terry Billingsley or the defendant before the night of the shootings. However, she had often heard her husband and Paul Peterson talk about Terry Billingsley in connection with their drug dealings. She testified that on the night of the shootings Paul, Greg, she and the baby had been in the kitchen of the Almo Street house when Greg had left the kitchen to answer the door. When Greg answered the door, he announced, "Terry is here," and two men entered. The first was tall and blond and carried a shotgun. The second was short and dark haired. She testified that she naturally assumed that the first man through the door was Terry Billingsley. She testified that shortly after the two men's arrival a brief argument ensued and the tall blond man shot Greg, then Paul. After the men had taken the decedents' wallets from their bodies, the tall blond man had demanded and taken all the money she had in her purse—$20; then the two men left.

When the police arrived after she called them, she had told them that the tall blond man, whom she named as Terry Billingsley, was the one who had shot Paul and her husband. The original criminal complaint named Terry Billingsley as the man who had actually shot the decedents.

Nearly two weeks later Randi was reading an issue of a local newspaper which carried a story concerning the shootings. The paper published photographs of Terry and Gaye Billingsley and of the defendant. Randi testified that she had told a friend that the newspaper had reversed the captions identifying the two men; Randi

thought the blond man was Terry Billingsley and the dark haired man was Delbert Crawford. Her friend had been acquainted with both Terry Billingsley and the defendant and assured Randi that the paper had correctly identified the two men. Randi then called the Burley police department to tell them that she had misnamed the tall blond man who had come to the house that night.

At the department's insistence, Randi came to department headquarters to view a photo lineup prepared by chief of detectives Pete Rodriguez. Rodriguez prepared a photo lineup using police photos of six young men. The photos of Terry Billingsley and the defendant appearing in the lineup were the same photos which had appeared in the newspaper which Randi had seen and had taken with her to the police station. Randi identified the defendant's picture in the photo lineup as a picture of the man who carried the shotgun and shot Greg and Paul and the picture of Terry Billingsley as the man who had accompanied him into the house.

The defendant argues that this photo lineup was impermissibly suggestive and that Randi's identification of him was not the product of her own independent observation, but was tainted by the photo lineup. He also argues that allowing Randi's identification into evidence was in violation of a right to have counsel present at a post-complaint photo lineup and a denial of the fundamental fairness guaranteed by the due process clause. We disagree.

We note first that the reliability of eyewitness identification, particularly in cases in which a suspect or a photograph of a suspect has been presented under potentially suggestive circumstances to a witness not previously acquainted with the suspect, has been a matter of ongoing scientific and judicial inquiry and disagreement. *See* Buckhout, Eyewitness Testimony, 231 Scientific American No. 6, at 23–31 (1974). The problem of ascertaining whether an identification was the product of a witness's independent observations or of the suggestion of those conducting live identifications

or lineups or photo lineups has been a frequently presented and sometimes vexing problem for the appellate courts. *E. g., Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *State v. Cunningham,* 97 Idaho 650, 551 P.2d 605 (1976); *Cooper v. State,* 96 Idaho 542, 531 P.2d 1187 (1975); *State v. Sadler,* 95 Idaho 524, 511 P.2d 806 (1973). The cases of the Supreme Court of the United States which we have cited reflect an evolution of the court's holdings as its membership changed during the 1960's and 1970's. *Ash,* the second most recent case in the group, clearly states that "the Sixth Amendment does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing the witness to attempt an identification of the offender." 413 U.S. at 321, 93 S.Ct. at 2579. Thus, the photographic lineup did not deny the defendant a right to counsel secured by the federal Constitution. Neither do we believe it denied him the right to counsel secured by Art. 1, § 13, of the Idaho Constitution. Therefore, Randi Solosabal's in-court identification of the defendant should have been suppressed only if the photographic lineup was so fundamentally unfair that it violated the due process clause of the state or federal Constitution. *State v. Cunningham,* 97 Idaho at 652, 551 P.2d at 607.

The due process test for suppression of an in-court identification that is allegedly tainted by an impermissibly suggestive out-of-court identification is wheth-er the out-of-court identification was so suggestive that there is a very substantial likelihood of misidentification. *Neil v. Biggers,* 409 U.S. at 198, 93 S.Ct. at 381; *State v. Cunningham,* 97 Idaho at 652, 551 P.2d at 607. This standard was reviewed in the recent case of *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), in which the Supreme Court of the United States reaffirmed its statements in *Biggers* and added: "[T]he admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." 432 U.S. at 106, 97 S.Ct. at 2249.

The record in this trial shows that Terry Billingsley is short and dark haired and that the defendant is tall and blond. Randi Solosabal never deviated from her original testimony that it was the tall blond man who carried the shotgun and shot the decedents and that the short dark haired man who accompanied him did not. She was shown a photo lineup containing six pictures, including those of the tall blond man and the short dark haired man who were being held as defendants. Throughout most of the morning of the day on which she was shown the photo lineup she had in her possession a newspaper with the identical pictures of the blond man and the dark haired man that were shown to her in the photo lineup. She had even taken this newspaper with her to the police station. The fact that she was able to identify the same pictures in the photo lineup that she had seen moments before in the newspaper may have been of little probative value; but certainly the photo lineup was not impermissibly suggestive of the identification of the defendant or Terry Billingsley when she had already spent the morning viewing a much more suggestive newspaper article. *But see United States v. Boston,* 508 F.2d 1171 (2d Cir. 1974), *cert. denied* 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975) (commenting about the potential prejudicial effect of releasing such photographs to the press). Under the totality of the circumstances, there is no basis in the record for

concluding that the photo lineup was impermissibly suggestive on the ground that there was a very substantial likelihood that it led to misidentification. *Cf. Manson v. Brathwaite,* 432 U.S. at 116, 97 S.Ct. at 2254; *Neil v. Biggers,* 409 U.S. at 199–201, 93 S.Ct. at 382–83; *Simmons v. United States,* 390 U.S. at 384–86, 88 S.Ct. at 971–72; *State v. Cunningham,* 97 Idaho at 652–53, 551 P.2d at 607–08. Randi Solosabal's in-court identification of the defendant was properly admitted into evidence.

C. *Admission of money seized incident to the Crawfords' and Billingsleys' arrest.* Randi Solosabal testified at trial that both her husband and Paul Peterson had received paychecks on the day of the shootings. She said that Paul had cashed a check for over $600 and Greg a check for over $500. She knew they had cashed their checks because Greg had given her some money from his check. She further testified that after the shootings she had seen Terry Billingsley remove Greg's wallet and the defendant remove Paul's. Randi stated that the defendant had then demanded all the money she had and that she gave him the $20 in her purse. There was no money left in Greg's or Paul's wallets after the assailant and his companion left.

Terry Billingsley testified that after the defendant had shot the two men he (Terry) had taken the money from Paul's wallet. Gaye Billingsley had testified that while she, her husband and the Crawfords were driving from Burley to Pocatello the defendant had counted out $469.00 and given it to her, telling her that he had killed Paul and Greg in response to her question asking where the money had come from. When the Crawfords and Billingsleys were arrested, Gaye was found to have $469.44 in her possession and the defendant $513.91 in his. The state moved to introduce the money seized from them into evidence over the defendant's objection. The defendant contends the trial court erred in admitting this money into evidence for several reasons unrelated to the illegal arrest issue we considered in Part IV–A of this opinion.

The defendant argues that there was insufficient foundation to admit the money into evidence. He said that because Randi Solosabal was not certain that the decedents had money in their possession immediately before the shooting, but simply knew that they had cashed their checks earlier in the day, her testimony was insufficient to connect the money with the shootings. We disagree. Evidence that the decedents had cashed their paychecks earlier in the day, that Randi had seen the defendant and Terry Billlingsley remove the decedents' wallets, and that the wallets had no cash left after the defendant and Terry Billingsley left is certainly sufficient nexus from which the jury could conclude that the fact that Gaye Billingsley and the defendant had large amounts of money in their possession when they were arrested was relevant to place Terry Billingsley and the defendant at the scene of the crime. The inferences necessary to bridge the gaps in the testimony—that the decedents had kept on their persons most of the money that they had received earlier in the day when they cashed their paychecks, that Terry Billingsley and the defendant had removed this money from the decedents' wallets after taking the wallets from their bodies, and that the money that they removed was most of the money that the Crawfords and the Billingsleys had in their possession when they were arrested—are hardly leaps of imagination contrary to common human experience. Thus, on the basis of Randi Solosabal's testimony alone, there was reason to admit the evidence because it tended to place the defendant at the scene of the crime and verify the accounts of the crime given by Randi Solosabal. As this Court said in *State v. Farris,* 48 Idaho 439, 282 P. 489 (1929):

> "The rule . . . is that any legal evidence which logically tends to prove or to disprove a material fact in issue is relevant and therefore admissible, provided it is not too remote or speculative or otherwise of such slight probative value as to justify the court in excluding it on the ground of immateriality." *Id.* at 446, 282 P. at 492.

■ Moreover, the testimony of Terry and Gaye Billingsley further connected the money with the shootings. The defendant argues, however, that the testimony of an accomplice cannot be a sufficient foundation for admission of physical evidence. In support of this position he cites I.C. § 19–2117. However, this argument misconstrues the statute which provides only that a conviction cannot be obtained solely on the testimony of an accomplice, but must be corroborated by other evidence tending to connect the defendant with the commission of the crime. The statute does not prohibit an accomplice from providing the necessary foundation testimony for the admission of an item of physical evidence.

■ Finally, the defendant argues that the admission of the money into evidence was prejudicial because he had not been charged with the crime of robbery of Paul Peterson and Greg Solosabal and the introduction of evidence tending to show that he had taken large amounts of money from them would inflame the jury. This argument is also without merit. A jury is entitled to a full and complete description of the events surrounding the commission of a crime regardless of whether this complete description may implicate a defendant in the commission of other crimes not charged. *State v. Izatt,* 96 Idaho 667, 534 P.2d 1107 (1975). Because the introduction of the money was clearly relevant to connecting the defendant with the crime, to providing a complete description of the circumstances of a crime and to showing a motive or purpose for the commission of the crime, there was no error in introduction of the money. On retrial, the district court should deny motions to exclude the money from evidence on any ground discussed in this section of the opinion.

The judgment of conviction is reversed and the cause remanded for a new trial.

McFADDEN, DONALDSON and BIST-LINE, JJ., concur.

SHEPARD, C. J., dissents without opinion.