OPINION OF THE COURT
Fuchsberg, J.
Defendant Donald Bouton appeals from an order of the Appellate Division affirming a judgment entered upon a verdict of a jury, which found him guilty of sodomy (Penal Law, § 130.50, subd 1; § 130.45) and sexual abuse (Penal Law, § 130.65, subd 1). The charges stemmed from an investigation of defendant’s allegedly lascivious conduct toward two juvenile complainants while they were at his home visiting his young son one day in 1977.
The indictment on which the defendant was tried further accused him of separate counts of statutory rape which he allegedly committed on December 18, 1972 and on November 18, 1973 by engaging in sexual intercourse with an underage female who then ran his household. In the course of the joint trial, at which both the 1977 and the 1972-1973 episodes were aired,[1] the prosecution, as part of its case and over objection, introduced evidence that the cohabitation between the defendant and his teen-age housekeeper was not confined to the two instances specified in the accusatory instrument, but was part of a continuing relationship during the course of which they engaged in ádditional, though uncharged, sexual activity almost daily over a period of years. Despite this proof, the jury *135 found the defendant not guilty of statutory rape. Whether it adversely influenced the result on the other counts is, of course, beyond our ken.
To support his present quest for vacatur of his convictions, Bouton relies on manifold assignments of error. Those which warrant our attention, taken in the order in which the events underlying them occurred, are (1) that inculpatory station house statements taken from the defendant should have been suppressed as the product of an unlawful arrest, (2) that the proffered proof of the extensiveness of defendant’s alleged relationship with his housekeeper should have been excluded, (3) that it was error for the trial court to reject his offer of proof of reputation, (4) that the jury’s deliberations were contaminated when documents which had been ruled inadmissible by the Trial Judge and were therefore marked only for identification found their way into the jury room during its deliberations, and (5) that the sanctity of the jury’s deliberations was further violated by a court clerk’s unauthorized intrusion into its precincts. We believe that at least two of the points mandate reversal.
The first of these, raised by a motion to suppress the statements Bouton had given to the police, contended they were the aftermath of an unlawful arrest (see People v Martinez, 37 NY2d 662; CPL 140.10, subd 1, par [b]). It is settled law that such a challenge casts on the prosecution the burden of coming forward with evidence that the arrest met the probable cause standard (see People v Malinsky, 15 NY2d 86, 91, n 2). Summary statements that the police had arrived at a conclusion that sufficient cause existed will not do. As on a warrant application, it is the responsibility of the neutral court, not the police, to determine whether the latter were justified in making the serious intrusion that the deprivation of another’s liberty constitutes. For that purpose, the court must be presented with facts, not assurances. The record shows that only the latter were offered to the Judge in this case.
The People’s sole witnesses at the pretrial suppression hearing were the two police officers who had effected the actual arrest. Though each testified in detail about his role in the arrest and interrogation, neither provided any specific information to support the claim that the investigation had by then unearthed sufficient facts to render suspicion of defendant reasonable. As to the investigation emanating from the *136 son’s playmates’ complaints, one officer, in conclusory and uninformative terms, merely advised the court that he had been "familiar” with the case. As to the relationship between Bouton and his young housekeeper, the officer’s equally inadequate explanation was that the contents of the admissions which were the subject of the hearing were not new to him. However, he again failed to reveal either the source of this knowledge or the occasion for his acquisition of it. Moreover, though he also testified he had advised the defendant of accusatory statements the police had obtained from the complainants, the court was not told the substance of such statements or when or how they were obtained. To add to the obscurity, the second officer’s testimony, if possible, was even more vacuous.
 Yet the court ruled that probable cause was demonstrated by the single officer’s testimony that "he had spoken to the various complainants” in the case. This was worth nothing. True, the officers who made the arrest need not personally have possessed reasonable grounds to believe the defendant had committed a crime; it could suffice that someone, somewhere in the investigative hierarchy did. One way or the other, however, it was incumbent upon the prosecution to point out the basis for this belief (see People v Holup, 29 AD2d 923). Because it failed to do so, the suppression Judge was reduced to sizing up the arresting officers rather than the evidence on which they had proceeded. The confessions should therefore have been suppressed (see People v Havelka, 45 NY2d 636).[2] But, since, even absent the confessions, the testimony of the complainants did not leave the People bereft of a prima facie case, this ruling calls for a new trial rather than dismissal of the indictment (CPL 470.20, 470.40).
The alternative ground on which we premise our reversal derives from the delivery into the jury room of exhibits which the Trial Judge had barred. This event occurred the morning of the day the verdict was announced. The jurors had arrived approximately half an hour before the clerk, and a court matron, presumably propelled by a burst of misplaced zeal, undertook to procure the exhibits for them. As it turned out, these documents had been stored for safekeeping with *137 other items that had never been admitted into evidence, and the whole batch was delivered to the jury en masse. Potentially most prejudicial of these were two versions of defendant’s confessions from which reference to uncharged sexual activity had not been redacted. Other exhibits for identification the unauthorized disclosure of which was likely to prejudice were hearsay laden psychiatric medical records of the statutory rape complainant and welfare records of her mother.
As a sequel to the tainting introduction of this forbidden material, when the clerk, upon arriving, discovered what had transpired, she added a further complication by taking it on herself to make an unauthorized entry into the jury room to retrieve the unadmitted exhibits from the hands of the jurors. As she was to disclose to the Trial Judge later, when the clerk observed from their location in the room that the exhibits appeared to have been scrutinized, she made free to admonish the jurors for having done so, a circumstance which defendant’s counsel was later to argue inhibited candid responses by the jurors at the court’s subsequent hearing on the incident. Even so, at least two jurors acknowledged that the excluded exhibits had been examined. The defense motion for a mistrial was nonetheless denied on the ground that the breaches of the jury barrier were harmless in view of the jurors’ testimony that, at the time of the flawed production of the exhibits, they had already reached agreement on the counts of which the defendant was convicted.
CPL 310.20 (subd 1) grants the trial court discretion to allow the jury to view any exhibit received in evidence at trial, but no provision authorizes submission of unadmitted exhibits. Departure from that rule affects important rights. Since an unadmitted exhibit has not undergone the test of cross-examination, its consideration by the jury directly infringes on the defendant’s right of confrontation. And, when the exhibit contains material specifically found by the court to be inadmissible (e.g., the unredacted confessions here), its presentation to the jury negates the very rights sought to be vindicated by the exclusionary ruling.
In our view this error was not harmless. Though the jurors by then may already have formed tentative opinions, because it was their privilege to change their minds until the verdict had been rendered, it is impossible to say whether this possibility was undermined and their inchoate determinations reinforced by the viewing of the judicially excluded matter. *138 Any post hoc rationalization to the contrary is necessarily speculative (see People v Diaz-Rosa, 22 AD2d 755; People v Dockum, 285 App Div 510, 513; People v Bartone, 12 Misc 2d 926, 930-931).
Nor may we ignore the related entry of the court clerk into the jury room, even though it appears to have been well motivated by her desire to salvage the erroneously delivered exhibits posthaste. The strong public policy favoring the absolute confidentiality of jury deliberations is not lightly to be disregarded (see CPL 310.10; cf. People v Ciaccio, 47 NY2d 431). While the fortuitous circumstances occasioning this intrusion are not likely to recur on retrial, we again take the opportunity to caution that only in the rarest and most inescapable of circumstances may so-called "emergencies” be dealt with other than under the direction of the trial court. The rights of the parties and the appearance of propriety demand strict adherence to that practice. (See, generally, People ex rel. Nunns v County Ct. of Nassau County, 188 App Div 424, 430; People v Bacon, 207 Misc 31.)
We now turn to the complaint that the court erred in precluding the calling of character witnesses who did not reside in the community in which Bouton lived. Alerted to defendant’s plan to do so, the District Attorney applied for an advance ruling on the matter. At this the Judge, without awaiting a response from counsel, advised that he would not permit evidence of reputation from witnesses who did not reside in the "same residential neighborhood” as defendant if their testimony would be directed to "negative reputation under People versus Van Gaasbeck [189 NY 408]”. After counsel indicated somewhat generally that he was prepared to call four witnesses who would testify to defendant’s freedom from an adverse reputation "so far as his morals are concerned” among those who had known him in the jewelry business community in which he had actively trafficked for up to 30 years, the court, while firmly adhering to its disposition of the matter, offered defendant the opportunity to amplify the record by putting the witnesses on the stand in the absence of the jury. Though counsel, by his election to stand instead on the colloquy, has left the matter of preservation of this point for review in some doubt, because the issue may be pressed at the new trial some guiding observations are in order.
It goes without saying that a defendant in a criminal *139 prosecution may introduce evidence that his character is such as to render it improbable that he committed the crime of which he is accused (People v Van Gaasbeck, 189 NY 408). While the nature of the defendant’s character is the object of the proof, reputation — the aggregate tenor of what others say or do not say about him — is the raw material from which that character may be established. Perhaps the most impressive measure of the respect the law accords the community’s ability to judge character is that the reputation of an accused for traits which, in the common experience of mankind, would tend to make it unlikely that he committed a particular offense may in and of itself give rise to a reasonable doubt of guilt where none would otherwise exist (People v Trimarchi, 231 NY 263, 266; see 1 Underhill, Criminal Evidence [6th ed, 1973], §§ 192, 196; 1 Wigmore, Evidence [3d ed, 1940], § 56).
The rule, however, is subject to a number of qualifications of which here relevant is the limitation that the reputation be specific to a particular community. In the relatively immobile societal climate in which the rule originally developed, the inhabitants of the geographical area in which a defendant resided were assumed to comprise the only community in which the general opinion of him would be a reliable gauge of character. However, the law has not been static in this regard. In harmony with the dynamics of modern social organization, particularly the phenomenon of urbanization, it came to recognize that an individual may have multiple and varied bases around which a reputation might form. So, he might be better known in the community of his employment and in the circle of his vocational fellows, where opportunities to evidence the traits at stake may occur with greater frequency than in the environs of his dwelling place, nestled in the anonymity of a large city or suburb (e.g., State v Jackson, 373 SW2d 4 [Mo]).
Thus, People v Colantone (243 NY 134) stands for the proposition that it is error to exclude proof of an accused’s favorable reputation within such parochial realms as a school, an infantry company and a veterans’ organization. (See, also, Thomas v People, 67 NY 218.) The principle is simple. A reputation may grow wherever an individual’s associations are of such quantity and quality as to permit him to be personally observed by a sufficient number of individuals to give reasonable assurance of reliability (5 Wigmore, Evidence [Chadbourn rev, 1974], § 1616). In short, the evidence must demonstrate a reputation rather than merely "individual and independent *140 dealings” (People v Colantone, 243 NY, at p 139, supra; see, generally, Ladd, Techniques and Theory of Character Testimony, 24 Iowa L Rev 498).
Given these criteria, the court’s pronouncement that provable reputation would be limited to that current in one’s "residential neighborhood” was, as noted, too restrictive (see, also, United States v Parker, 447 F2d 826; People v Cobb, 45 Cal 2d 158; People v Kronk, 326 Mich 744; State v Jackson, 373 SW2d 4 [Mo], supra). And, the fact that the offer consisted solely of "negative evidence” — i.e., the absence of adverse comment on the pertinent aspects of defendant’s character— could not in itself be the basis for an exclusionary ruling (People v Van Gaasbeck, 189 NY 408, supra).
It follows that, in light of the milieu from which counsel assured the court he would draw his witnesses, analysis should focus particularly on the breadth of defendant’s business contacts. Surely, it is not to be assumed out of hand that a person pursuing an occupation for as long as 30 years may not have had the opportunity to engage in transactions involving individuals sufficient in number to constitute a reliable source of reputation, always bearing in mind, of course, that, in a business milieu as in a residential one, the predicate for the admission of testimony of reputation is a showing that the witnesses were in a position to know the nature of the defendant’s general reputation (People v O’Regan, 221 App Div 331).
Finally, we offer some anticipatory comment against the possibility that at the second trial the People will again press for the introduction of evidence to show that Bouton and his partner in the statutory rape episodes of which he was acquitted had engaged in other, uncharged instances of such conduct almost daily for three years. The acquittal precludes further use of these instances because they do not share the crucial features of similarity of conduct, identity of victim and contemporaneity of occurrence with the sexual abuse charges that remain. Thus, there is no longer any premise for ruling that the probative value of these events overrides the risk that the defendant might be condemned for acts other than those for which he is being tried (People v Thompson, 212 NY 249; see, also, People v Molineux, 168 NY 264, 291-294; Stone, Rule of Exclusion of Similar Fact Evidence: America, 51 Harv L Rev 988, 1034; Anns., 167 ALR 565, 77 ALR2d 841, 88 ALR3d 8).
*141 For these reasons, and with the accompanying observations, the order of the Appellate Division should be reversed and a new trial ordered.

. No motion to sever was ever made (see CPL 200.20, subd 3).

. This result obtains irrespective of the administration of Miranda warnings and the voluntariness of the confessions, for in the absence of proof to the contrary the arrest was presumptively without foundation in probable cause (see Dunaway v New York, 442 US 200).