676 P.2d 31

STATE of Idaho, Plaintiff-Respondent,

v.

**Donald M. PARADIS,**
**Defendant-Appellant.**

No. 14565.

Supreme Court of Idaho.

Dec. 19, 1983.

Rehearing Denied Feb. 14, 1984.

William V. Brown, Coeur d'Alene, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Larry K. Harvey, Chief Deputy Atty. Gen., Boise, for plaintiff-respondent.

BAKES, Justice.

Appellant appeals his conviction for first degree murder and the sentence of death imposed upon that conviction. Our review is in response to his appeal, and, in addition, we review this case pursuant to our duty to automatically review capital cases. I.C. § 19–2827.

In June of 1980, Scott Currier arrived in Spokane, Washington, with his fiancee. Sometime during that month they became acquainted with members of a Spokane motorcycle gang, including appellant, through a chance meeting in a Spokane park. Currier and the deceased, Kimberly Palmer, had known each other for five years and previously dated. On June 19, 1980, Palmer and Currier left Palmer's Spokane residence to go to Idaho on a camping trip, driving a blue and white van owned by Currier's fiancee.

The next evening, Friday, June 20, Currier and Palmer checked into a motel located around the corner from appellant's Spokane residence. After checking in, they were observed looking for something in the rear of the van. Currier then went back to the motel clerk and asked for a return of his money, indicating several guns had been stolen, he knew who did it, and he was going to retrieve them. Currier and Palmer then left the motel.

On Saturday morning, June 21, at approximately 6:30 a.m., a blue and white van was observed driving up a steep, sparsely populated mountain road south of Post Falls, Idaho. In the van were two or three men, one wearing a gray cap. Thirty minutes later, three men were observed on foot, coming down the same steep mountain road. Witnesses later identified these three men as Donald Paradis, appellant here, Thomas Gibson and Larry Evans. Within the next thirty minutes, these same three men were seen at various locations in Post Falls. One was carrying what some observers believed to be a rifle rolled up in a blanket. Post Falls police received a report of a man with a gun, and upon investigation made contact with the three men outside a drive-in restaurant. From identification cards shown to police, the three were positively identified as appellant, Gibson and Evans.

On Sunday morning, June 22, Post Falls police received a report of a one-car rollover on the aforementioned mountain road. Upon investigation, they discovered the van, overturned, with various items scattered around it. Upon closer inspection an officer discovered Kimberly Palmer's body lying face down in a creek 70 to 80 feet away from the van. Later, Scott Currier's body was found near the van stuffed into a sleeping bag tied with a small piece of terry cloth. Currier's belt was also in the bag, with a distinctive brass buckle missing, apparently cut off the belt. Lying under Palmer was a distinctive light blue Levi cap, identified as belonging to Larry Evans. Currier had been beaten severely around the head. Palmer had been manually strangled. There was evidence at trial suggesting that Palmer was still alive when she was placed in the stream bed.

Early Sunday morning, June 22, between 4:30 and 5:00 a.m., appellant's residence in Spokane, Washington, was severely damaged by an arson fire. An investigator, who was on the scene to determine the cause of the fire, observed a rolled-up rug, in the basement of the house, surrounded by a reddish fluid. In the rug were Currier's missing brass belt buckle, a blue colored lawn dart with traces of blood on the end, and a piece of blue terry cloth. The lawn dart closely matched puncture wounds in Currier's back. The piece of blue terry cloth matched the piece of terry cloth used to tie up the sleeping bag where Currier's body was found. Testimony placed appellant at the residence in the early morning hours before the fire began.

Appellant was arrested on Monday, June 23, at an abandoned gas station where he had been staying since the fire. Recovered from appellant's vehicle was a blue blanket previously left in the van by Currier's fiancee.

An autopsy was performed upon both victims. A major issue at trial concerned jurisdiction over the crime because, although strong physical evidence indicated that Currier was battered and probably killed at appellant's house in Washington, other evidence indicated that Palmer was most likely killed in Idaho. A major part of the autopsy dealt with the differences that existed between the two bodies. Currier's body had decomposed significantly by the time of the autopsy. Palmer's body had not decomposed. This indicated to the medical examiner that Currier had been killed some hours before Palmer. Another difference between the two bodies was that Palmer's lungs were half filled with water. The medical examiner hypothesized that this was because Palmer lay face down in the creek while still gasping for breath. Based on this evidence, the prosecution theorized that Palmer, a witness to Currier's murder, was still alive when the van was driven to Idaho and was killed to prevent

her from identifying the persons who killed Currier.

Appellant was charged in Washington with the murder of Scott Currier. After a trial, he was acquitted. He was then extradited to Idaho for trial in the murder of Kimberly Palmer.

Initially, appellant filed a motion *in limine* to exclude evidence concerning the death of Scott Currier. The trial court denied the motion, ruling that the evidence was admissible to portray a "rational and cohesive scenario." Evidence of Currier's death was introduced in the Idaho trial over the continuing objection of appellant.

## I.

### A.

First, appellant alleges that the trial court erred in not giving a certain instruction to the jury. Appellant alleges that under Idaho law, where a criminal case rests entirely upon circumstantial evidence, the jury must be instructed to find the defendant guilty only if the facts are entirely consistent with his guilt. *See State v. Davis*, 69 Idaho 270, 206 P.2d 271 (1949); *State v. McLennan*, 40 Idaho 286, 231 P. 718 (1925); *State v. Marcoe*, 33 Idaho 284, 193 P. 80 (1920).

In *State v. Holder*, 100 Idaho 129, 594 P.2d 639 (1979), we reversed a defendant's conviction for failure to give the following requested instruction:

"You are not permitted to find the defendant guilty of the crime charged against him based on circumstantial evidence unless the proved circumstances are not only consistent with the theory that the defendant is guilty of the crime, but cannot be reconciled with any other rational conclusion and each fact which is essential to complete a set of circumstances necessary to establish the de-

fendant's guilt has been proved beyond a reasonable doubt.

"Also, if the evidence is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence, and reject the other which points to his guilt." 100 Idaho at 132, 594 P.2d 639.

The trial judge in *Holder* had given an instruction which merely distinguished between circumstantial and direct evidence and did not explain the effect of a circumstantial case. Appellant here contends that the trial court erred in the same manner, in that he gave insufficient instructions on the effect of a circumstantial case. However, unlike in *Holder*, the trial judge here gave the following instruction at the beginning of appellant's trial:

"To convict the defendant, the evidence must, to your minds, exclude every reasonable hypothesis other than the guilt of the defendant. If after consideration of all the evidence in the case, you may reasonably explain the facts given in evidence on any reasonable ground other than the guilt of the defendant, you must acquit."

This instruction, which was not objected to, sufficiently informed the jury that it could not convict the appellant unless all the facts were consistent with guilt, and excluded any reasonable hypothesis other than guilt. This is in effect the same type of instruction we indicated should have been given in *State v. Holder, supra*. It informs the jury of its duty in a case involving only circumstantial evidence. Accordingly, there was no error in failing to give any further instructions on that issue.[1]

### B.

Appellant also contends that insufficient evidence was presented at trial to convict him of the crime charged. He

1. Nor did the trial court err in giving this instruction at the beginning of the trial rather than at the end. The court reminded the jury at the beginning and end of trial that the instructions were to be considered as a whole, both those given at the beginning and those given at the end. He also indicated that all of the instructions were to be taken into the jury room in written form and considered there as a whole.

argues that only circumstantial evidence connects him to the scene, and that to be convicted of the principal offense it must be shown that an aider and abettor possessed the same intent as the principal. Appellant argues that the proof at trial failed in this respect, and that on the evidence presented no reasonable jury could have convicted appellant. He also argues that the prosecution did not sufficiently prove beyond a reasonable doubt that the murder was committed in Kootenai County. Appellant's reliance upon these arguments is misplaced since a defendant can be convicted solely on circumstantial evidence. *State v. Chapple*, 98 Idaho 475, 567 P.2d 20 (1977); *State v. Ponthier*, 92 Idaho 704, 449 P.2d 364 (1969). The state presented a strong circumstantial case against appellant. He was placed at or near the scene where the victim's body was found, in the company of a person, Larry Evans, who was almost certainly in or around the scene at the time of the murder (as indicated by the presence of his hat under Palmer's body). The area was sparsely populated, and very few people used the road where the van was found; thus, the presence of strangers in the area was conspicuous. Witnesses observed a van Palmer and Currier had been driving on that road shortly before three men, whose identities were established, including appellant, were observed leaving the area on foot. The presence of these men on foot left little doubt that they had reached the area in the van. In addition, strong evidence of motive was presented in that appellant was strongly linked, by evidence discovered in his house, to the death of Scott Currier. Currier's distinctive brass belt buckle, cut off his belt, was found at appellant's house. The belt was found on Currier's body. A lawn dart which was used to stab Currier in the back was found in appellant's house. Pieces of terry cloth identical to those used to tie Currier into the sleeping bag were found in appellant's house. There was evidence that an attempt was made to clean the house after Currier's death, as evidenced by the bloody rug hidden in the basement, with rags having been washed in a washing machine. An arson caused fire had been set in appellant's house in an apparent attempt to destroy all of this evidence. There was a strong inference that appellant attempted to leave the area after the killings. Also, a blue blanket that had been in Currier's fiancee's van was found in appellant's car when he was arrested. The circumstantial evidence presented in this case was more than sufficient to support the conviction of appellant for aiding and abetting the murder of Kimberly Palmer.

### C.

As previously noted, appellant was tried in Washington for the murder of Scott Currier, and acquitted. Evidence connecting appellant to Currier's death was introduced in the Palmer trial over appellant's objections. Appellant contends that the admission of this evidence was error; thus, his conviction is tainted and must be reversed.

▮ Evidence connecting appellant to the death of Scott Currier constitutes evidence of another crime for which appellant was not on trial in the present case. Generally, evidence of other crimes of a defendant is not admissible at trial to show the defendant's criminal propensity. *State v. Needs*, 99 Idaho 883, 591 P.2d 130 (1979); *State v. Wrenn*, 99 Idaho 506, 584 P.2d 1231 (1978). Such evidence may be introduced, however, if the evidence falls within one of the generally recognized exceptions to the general rule.

"However, this jurisdiction will admit evidence of defendant's past criminal activity to prove: (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, (5) the identity of the person charged with the commission of the crime on trial, and (6) other similar issues." *State v. Needs, supra*, 99 Idaho at 892-3, 591 P.2d at 139-40.

The evidence of the Currier death was presented not for the purpose of showing appellant's criminal propensity, but for the purpose of showing motive and a common scheme and especially to indicate to the jury the entire factual situation presented in this case, as stated by the trial judge, a "rational and cohesive scenario," also a use which is permissible. *State v. Izatt,* 96 Idaho 667, 534 P.2d 1107 (1975); *State v. Dayley,* 96 Idaho 527, 531 P.2d 1172 (1975); *State v. Dillon,* 93 Idaho 698, 471 P.2d 553 (1970), *cert. denied* 401 U.S. 942, 91 S.Ct. 947, 28 L.Ed.2d 223 (1971).

■ However, the situation in this case is slightly different from previous Idaho cases in that the "other crime" of which evidence is being introduced was a crime for which the appellant has been acquitted. Nevertheless, evidence of a prior acquitted crime is generally allowed if it falls within one of the recognized exceptions already noted. *See, e.g., Hernandez v. United States,* 370 F.2d 171 (9th Cir.1966); *Buatte v. United States,* 350 F.2d 389 (9th Cir. 1965), *cert. denied.* 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83 (1966); *Ladd v. State,* 568 P.2d 960 (Alaska 1977); *People v. Vaughn,* 71 Cal.2d 406, 78 Cal.Rptr. 186, 455 P.2d 122 (1969); *People v. Douglas,* 246 Cal.App.2d 594, 54 Cal.Rptr. 777 (1966); *Davis v. State,* 277 So.2d 311 (Fla.App. 1973); *Jenkins v. State,* 147 Ga.App. 21, 248 S.E.2d 33 (1978); *State v. Darling,* 197 Kan. 471, 419 P.2d 836 (1966); *People v. Bolden,* 98 Mich.App. 452, 296 N.W.2d 613 (1980); *State v. Schlue,* 129 N.J.Super. 351, 323 A.2d 549 (1974); *State v. Yormark,* 117 N.J.Super. 315, 284 A.2d 549 (1971); *State v. Smith,* 271 Or. 294, 532 P.2d 9 (1975); *State v. Tarman,* 27 Wash.App. 645, 621 P.2d 737 (1980). *See also* Annot., Admissibility of evidence as to other offense as affected by defendant's acquittal of that offense, 86 A.L.R.2d 1132 (1962).

■ However, appellant raises another objection to admissibility. He contends that allowing admission of this "other crimes" evidence, where he has been acquitted, would violate his rights under the fifth amendment to the United States Constitution, specifically the double jeopardy clause with its attendant collateral estoppel rule. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).[2] After a careful examination of this argument, we conclude that, in the context of this case, admission of this evidence did not violate appellant's fifth amendment rights.

The fifth amendment's double jeopardy guarantee applies to the states through the fourteenth amendment. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). In *Ashe v. Swenson, supra,* the defendant was charged with six counts of robbery, for robbing six participants in a poker game. After acquittal on one count, he was tried on a second count. The question before the court in *Ashe* was whether there exists an element of collateral estoppel in the fifth amendment guarantee against double jeopardy, as applicable to the states, that would preclude a state from retrying a defendant where the ultimate issue (in *Ashe,* identification of a perpetrator) had already been necessarily determined at a previous trial. The Supreme Court adopted the view that there is an element of collateral estoppel in the fifth amendment which would prevent the second trial.

One federal circuit has used the rationale in *Ashe* to forbid evidence of "other crimes," where a defendant has been acquitted of that crime. *Wingate v. Wainwright,* 464 F.2d 209 (5th Cir.1972) (evidence that defendant robbed two establishments, where acquitted of those robberies,

---

2. There is a question whether collateral estoppel would even apply to a situation where the defendant is being prosecuted by two separate sovereigns. In the present case we are dealing with *two separate offenses,* one committed against one sovereign state, and another in a different sovereign state. Thus, collateral estoppel might not even apply here because the "same parties" requirement of collateral estoppel has not been met. However, for purposes of this discussion, we choose to show why, in the context of the facts presented here, collateral estoppel would not prevent a retrial of the defendant even if the same sovereign *were* prosecuting him.

not admissible in trial on third separate robbery). However, *Ashe* and *Wingate* are distinguishable from this case, which can best be shown by comparing the facts of the present case to the facts in *King v. Brewer*, 577 F.2d 435 (8th Cir.1978), *cert. den.* 440 U.S. 918, 99 S.Ct. 1238, 59 L.Ed.2d 468 (1979).

In *King*, the appellant, a *habeas* petitioner, had been convicted in state court of the robbery of a particular store. This store had been robbed at 7:00 p.m.; another store was robbed at 4:30 a.m. the following morning. Appellant was arrested and charged with both robberies. He was tried for the morning robbery first and acquitted. At the subsequent trial for the evening robbery, testimony of appellant's involvement in the morning robbery was presented. The *King* court first ruled that *Ashe* was not applicable.

"In the *Ashe* case the separate charges arose out of the same transaction or occurrence. The critical issue in the *Ashe* case was whether Ashe was a participant, with others, in the robbery of the six players. In acquitting Ashe in the first trial, the jury found that Ashe was not a participant in the robbery of the six players. In the second trial the jury found that he was a participant in the robbery of the six players. In contrast, in this case appellant was charged with committing two separate and distinct robberies of two different stores, separated by distance, circumstances, and time of about nine and one-half hours. These facts distinguish this case from the *Ashe* case." 577 F.2d at 440.

Similarly, the present case is distinguishable from *Ashe*. Appellant here was charged with committing two separate and distinct crimes, the murders of two separate persons, separated by time, distance and circumstances.[3]

The appellant here seeks to foreclose from consideration any alleged connection between himself and the death of Scott Currier. However, here, as in the *King* case, the evidence of Currier's death and its connection to appellant was not introduced for the primary purpose of showing the guilt of appellant regarding the death of Currier, but rather to explain to the jury a possible motive the appellant may have had to participate in the murder of Kimberly Palmer and to connect him with that murder. The jury in the Washington case could very well have believed that appellant had a connection with Currier's death, but that the state did not prove beyond a reasonable doubt that appellant was the actual murderer of Currier. Additionally, the Washington jury might have had a reasonable doubt on the issue of whether Currier was killed in Washington or in Idaho, and thus acquitted because of that doubt. A verdict of acquittal in the previous case does not preclude all possibility of knowledge on the part of appellant of the circumstances of the death of Currier. It was this evidence of knowledge on the part of the defendant that the prosecution sought to use to indicate to the jury a possible motive and implication in Palmer's death. The prosecution did not seek to prove once again that appellant was involved in Currier's death, but only sought to show that appellant had a motive to aid in a cover-up of the Currier murder by helping to eliminate Kimberly Palmer as a witness. Regardless of his guilt or innocence in Currier's death, the evidence of that death is still highly relevant in showing a possible motive for appellant's involvement in Palmer's murder. Because

**3.** The court in *King* also considered the effect of the Fifth Circuit cases following *Wingate*. *See Blackburn v. Cross*, 510 F.2d 1014 (5th Cir.1975); Expanding Double Jeopardy: Collateral Estoppel and the Evidentiary Use of Prior Crimes of Which the Defendant has been Acquitted, 2 Fla. State Univ.L.Rev. 511 (1974). In *Wingate* and *Blackburn*, the two principal cases in the Fifth Circuit, the evidence of the prior crime was primarily being introduced to prove the identity of the accused as the perpetrator of the crimes, including those crimes of which he was acquitted. Thus, the *King* court noted that those cases were also factually distinguishable from their own case. The evidence in *King* was being introduced not to show guilt of the accused in the acquitted crime, but rather to impeach the defendant's testimony of alibi. Its primary purpose was not to establish the defendant's guilt in the morning robbery.

the verdict of acquittal did not necessarily preclude or decide finally the question of appellant's knowledge of the circumstances surrounding Currier's death or the tie-in between Currier's death and Kimberly Palmer's death, the doctrine of collateral estoppel did not preclude introduction of evidence of Currier's death at the Palmer trial.

## II.

Appellant next challenges the validity of the death penalty imposed on his conviction. He asserts that the penalty is disproportionate and excessive in this case for the following reasons: (1) there was a lack of jury participation in the capital sentencing process, which participation is constitutionally required; (2) one of the aggravating circumstances in Idaho's death penalty law is unconstitutionally vague; (3) the death penalty cannot be imposed upon a defendant who is found guilty only of aiding and abetting in the murder; (4) the circumstances in this case do not provide a sufficient foundation for imposition of the death penalty. We will consider appellant's assertions in the above order.

## A.

Appellant's first assertion is that involvement of the jury in the sentencing process in capital cases is constitutionally required. This assertion is disposed of by two recent cases in which we have considered this exact question and rejected the argument. In *State v. Creech*, 105 Idaho 463, 670 P.2d 463 (1983), we held "that there is no federal constitutional requirement of jury participation in the sentencing process and that the decision to have jury participation in the sentencing process, as contrasted with judicial discretion sentencing, is within the policy determination of the individual states." We went on to hold that "the policy judgment of our legislature, which places capital sentencing discretion in the district judges of our state with mandatory appellate review vested in this Court of statewide jurisdiction, meets any test of constitutionality." In *State v. Sivak*, 105

Idaho 900, 674 P.2d 396 (1983), we again considered the question of whether the federal constitution prohibits a statutory scheme that does not provide for jury participation, and in addition, we considered the question of whether our own state constitution prohibits such a statutory scheme. We once again upheld our own statutes, rejecting the notion that the federal constitution requires jury sentencing, and also concluding that nothing in the state constitution prohibits a statute which does not provide for jury participation. Thus, this issue was thoroughly covered in both of these previous cases, and our decisions in those cases controls here.

## B.

■ Appellant argues that the statutory aggravating circumstance found in I.C. § 19-2515(f)(6), that "the defendant exhibited utter disregard for human life," is unconstitutionally vague. The United States Supreme Court has previously required clear standards which guide the discretion of the sentencing body. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *See also, State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981). If the language of the statutory provision itself does not contain a sufficiently clear standard, it is the duty of the state courts to place limiting constructions upon the statutory aggravating circumstances "so as to avoid the possibility of their application in an unconstitutional manner." *State v. Osborn, supra* at 418, 631 P.2d at 200. The aggravating circumstance challenged here has been considered in two previous Idaho cases and, with the aid of a limiting construction placed upon it, has been upheld as constitutional. In *State v. Osborn, supra*, we concluded that the phrase under consideration here "is meant to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer." *Id.* at 419, 631 P.2d 187. In *State v. Creech, supra*, we once again upheld the constitutionality of this statutory aggravating cir-

cumstance. In light of our decisions in these two cases, further consideration of the identical argument presented here is not necessary.[4]

## C.

Appellant argues that a death penalty cannot be imposed in this case because he was merely an aider and abettor, and no proof was presented that appellant was the actual killer of Kim Palmer. Appellant relies on the recent United States Supreme Court case of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In *Enmund*, the court considered the question of whether a person convicted only of felony murder can be sentenced to death. Enmund was the driver of the getaway vehicle in a planned robbery during which the two principals killed the victims. There was no showing that Enmund intended the killings, only that he was a knowing participant in the robbery, during which the victims were killed. The court resolved the question in Enmund's favor.

> "[I]t is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. We have concluded, along with most legislatures and juries, that it does not.
>
> . . . .
>
> "... The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for Enmund's own conduct. The focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims,

for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence.'" 458 U.S. at 797–98, 102 S.Ct. at 3376–77, (emphasis in original).

The court held that since Enmund's criminal culpability extended only to the robbery, imposition of the death penalty for Enmund's own culpability was excessive and disproportionate and thus a violation of the eighth amendment.

 *Enmund* does not require a reversal of the sentence imposed in this case for several reasons. First, appellant was convicted of murder, not felony murder. Felony murder is defined as:

> "Any murder committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, kidnapping or mayhem is murder of the first degree." I.C. § 18–4003(d).

Under the felony murder rule, a defendant who participates in a robbery can be held liable for the death of any person killed during the commission of that robbery, regardless of the individual defendant's intent that a death occur. Appellant was convicted of aiding and abetting in the commission of a murder, an offense which necessarily involves an intent on the part of a defendant that a murder take place. We have already ruled that the evidence was sufficient to support a conviction on this charge. Although the United States Supreme Court ruled out imposition of the death penalty in a felony murder case, they did so because the felony murder offense involved in *Enmund* did not require, and the facts of the case itself did not warrant, a finding that the defendant entertained an intent that the victims of the robbery be killed. Such an intent to kill was required by the offense for which appellant was convicted.[5]

---

**4.** Since we have decided that appellant's sentence was validly imposed because the trial court found these circumstances to exist beyond a reasonable doubt, and the circumstances withstand constitutional scrutiny, it is unnecessary for us to consider the state's argument that the sentence is also warranted under I.C. § 19–2515(f)(10), a circumstance that the trial court

found existed, but ruled legally inapplicable to this case.

**5.** In addition, note:
**"19–2515. Inquiry into mitigating or aggravating circumstances—Sentence in capital cases—Statutory or aggravating circumstances—Judicial findings.—** . . .

The trial judge instructed the jury that murder of the first degree requires a clear, deliberate intent to kill on the part of the defendant. He further instructed the jury that:

"You are instructed that all persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense or aid and abet in its commission, are principals in any crime so committed, and as principals are guilty of any crime so committed.

"You are instructed that to aid and abet means to *knowingly assist, facilitate, promote, encourage, counsel, solicit or invite the commission of a crime.*" (Emphasis supplied.)

Thus, the jury would necessarily have to find that the defendant intended that a life be taken before it could find him guilty of first degree murder. This type of moral culpability is all that the United States Supreme Court would require under *Enmund.* Because such a moral culpability necessarily exists in the present case, imposition of the death penalty is not disproportionate and unjust.

### D.

Appellant also argues that the circumstances in the present case are not sufficient to support the imposition of the death penalty. In making this argument, appellant essentially reiterates some of the earlier arguments made, including that the death penalty is excessive in cases based on aiding and abetting, and that the circumstances did not reflect "utter disregard for human life." We find that this argument, being basically a reiteration of defendant's previous arguments does not merit consideration.

. . . .
"(f) The following are statutory aggravating circumstances, at least one (1) of which must be found to exist beyond a reasonable doubt before a sentence of death can be imposed:
. . . .
(7) The murder was one defined as murder of the first degree by section 18–4003, Idaho Code,

### III.

Finally, we reach that point where we conduct our independent review of this case under I.C. § 19–2827. The purpose of our review is to examine the proceedings in the trial court to ensure that the sentence of death was imposed without resort to passion or prejudice or any other arbitrary factor; that the evidence supports the trial court's findings of statutory aggravating circumstances; and that the sentence of death is not excessive or disproportionate. I.C. § 19–2827.

In this case, all of the procedures mandated in potential death penalty cases, such as appellant's attendance at the pronouncement of sentence, written findings of the trial judge on aggravating and mitigating circumstances, etc., were followed. The state gave appellant notice that it intended to ask for the death penalty and gave notice of its intent to rely on the aggravating circumstances in I.C. § 19–2515(f)(6), (8), and (10). Appellant was also allowed to submit a document, which was considered by the court, outlining what he felt were the mitigating circumstances that should be considered. An aggravation/mitigation hearing was held, evidence taken, and arguments heard. I.C. § 19–2515(d). The trial court then issued written findings indicating the mitigating factors considered and the aggravating factors found beyond a reasonable doubt.

■ In our independent review, we note that the trial court considered testimony given by Thomas Gibson during his separate trial for first degree murder of the same victim, Kimberly Palmer. This testimony was sworn testimony given in open court, although not in the trial of this particular cause. The trial court took judicial notice of the testimony because of its ruling that appellant had "agreed to consider-

subsections (b), (c), (d), (e) or (f), *and it was accompanied with the specific intent* to cause the death of a human being." (Emphasis added.)
The felony murder rule is contained in I.C. § 18–4003(d); thus, it is included in the above aggravating circumstance.

ation of such testimony and to dispense with formal application of I.C. § 19–2516 ....'' We find no error in the trial court's ruling on this issue, considering the fact that the defendant did request that the trial court take notice of this testimony in mitigation of sentence, and the fact that the testimony itself was given under oath in an open courtroom. The testimony of Gibson, thus validly taken into consideration, further supported the notion that Kimberly Palmer was killed to cover up the murder of Scott Currier. Gibson testified that he aided in the murder of Palmer by knocking her to the ground at the Paradis house in an effort to prevent her from leaving the house after Currier's murder, so that she could not inform the authorities of what she had witnessed.

█ The court, in its findings, found no mitigating circumstances, and it found one statutory aggravating circumstance beyond a reasonable doubt, noting that "there is nothing which outweighs the gravity of the aggravating circumstance.'' This is not a case like *State v. Osborn, supra*, where the trial court failed to find any mitigating circumstances, but at the same time failed to set forth those mitigating circumstances which it considered. In this case, the trial court considered all of the possible mitigating circumstances urged by appellant, and also considered the possibility of the existence of six additional mitigating circumstances, but after consideration decided that none of the factors either suggested by appellant or considered by the court on its own constituted a mitigating circumstance. We find no error in the procedure followed by the trial court in making its findings.

█ We are also required under I.C. § 19–2827 to conduct a review of the sentence imposed, and the sentences imposed in similar cases, to assure that the sentence in this case was not excessive or disproportionate. We recently conducted an extensive review of Idaho murder cases and find that the sentence imposed in this case is not disproportionate to the sentence imposed in those cases where the death sen-

tence was available as a form of punishment. We have also compared this case with our recent death penalty cases in *State v. Creech, supra*, and *State v. Sivak, supra*, and find that the sentence imposed in the present case is proportionate to the sentences imposed in those cases. In fact, the crime committed in the present case is the same type of crime as that committed in *State v. Sivak, supra*. In *Sivak*, the trial court found that one of the reasons the victim was killed was to prevent her from identifying the defendant as the perpetrator of a robbery. In this case, the motive for the killing of Kimberly Palmer was identified by the trial court as a preventative measure, *i.e.*, to prevent her from speaking to others about the circumstances surrounding the murder of Scott Currier. We find that the penalty imposed in this case is both proportionate and just.

The judgment of conviction and sentence imposed are affirmed.

DONALDSON, C.J., and SHEPARD, J., concur.

BISTLINE, Justice, dissenting, in which HUNTLEY, Justice, concurs.

The record before us is literally fraught with error at every stage of the proceedings. However, in considering that record, I focus on but two of the more prominent errors that mandate reversal.

I.

As the majority notes, the appellant was tried in Washington for the murder of Scott Currier prior to his Idaho trial for the murder of Kimberly Palmer. Appellant was acquitted for Currier's murder by a Washington jury. Despite that acquittal, however, and over appellant's timely objection, evidence connecting appellant to Currier's death was introduced in the Palmer trial. Appellant contends that the admission of this evidence was error. I agree and would, on this basis, reverse.

The evidence submitted by the prosecution linking appellant to the Currier murder was both extensive and highly prejudicial.

The proffered evidence included the following photographs of Currier's body, both at the site at which it was discovered and at the autopsy; photographs of evidence seized from appellant's house relating to Currier's murder; descriptions by investigating officers of both the murder and the evidence seized from appellant's home; a thorough description by the coroner of the autopsy performed on Currier; and even reference by a Spokane County identification officer to Currier as "the victim." All of this in a trial for the murder of Kimberly Palmer!

However, in view of the United States Supreme Court case of *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), and its progeny, it is clear that the doctrine of collateral estoppel bars the use of such evidence. *Ashe* applied the collateral estoppel to criminal proceedings as part of the Fifth Amendment guarantee against double jeopardy. As the Supreme Court noted:

"For whatever else that constitutional guarantee may embrace, *North Carolina v. Pearce*, 395 U.S. 711, 717 [89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969)], it surely protects a man who has been acquitted from having to 'run the gauntlet' a second time. *Green v. United States*, 355 U.S. 184, 190 [78 S.Ct. 221, 225, 2 L.Ed.2d 199 (1957)]."

397 U.S. at 446, 90 S.Ct. at 1195.

Following the Supreme Court's lead in *Ashe*, the Fifth Circuit Court of Appeals applied collateral estoppel to cases such as the one before us where the state seeks to introduce evidence of prior acquitted criminal charges as evidence in a subsequent prosecution. In *Wingate v. Wainwright*, 464 F.2d 209 (5th Cir.1972), the Fifth Circuit Court stated:

"We do not perceive any meaningful difference in the quality of 'jeopardy' to which a defendant is again subjected when the state attempts to prove his guilt by relitigating a settled fact issue which depends upon whether the relitigated issue is one of 'ultimate' fact or merely an 'evidentiary' fact in the second

prosecution. In both instances the state is attempting to prove the defendant guilty of an offense other than the one of which he was acquitted. In both instances the relitigated proof is offered to prove some element of the second offense. In both instances the defendant is forced to defend again against charges or factual allegations which he overcame in the earlier trial. We are in agreement with Judge Friendly's conclusion in *United States v. Kramer*, 289 F.2d 909 (2d Cir.1961).

" 'The Government is free, within the limits set by the Fifth Amendment, ... to charge an acquitted defendant with other crimes claimed to arise from the same or related conduct; but it may not prove the new charge by asserting facts necessarily determined against it on the first trial, no matter how unreasonable the Government may consider that determination to be.'

. . . .

"... The prosecution simply may not in the course of any subsequent trial of the same parties relitigate an issue which was determined as an issue of ultimate fact in an earlier prosecution.

. . . .

"... We hold that under *Ashe* where the state in an otherwise proper prosecution seeks for any purpose to relitigate an issue which was determined in a prior prosecution of the same parties, then the evidence offered for such a relitigation must be excluded from trial and the state must be precluded from asserting that the issue should be determined in any way inconsistent with the prior determination.

"It is fundamentally unfair and totally incongruous with our basic concepts of justice to permit the sovereign to offer proof that a defendant committed a specific crime which a jury of that sovereign has concluded he did not commit. Otherwise a person could ever remove himself from the blight and suspicious aura

which surround an accusation that he is guilty of a specific crime."[1]

464 F.2d at 213–14.

*See also Blackburn v. Cross,* 510 F.2d 1014 (5th Cir.1975); *State v. Perkins,* 349 So.2d 161 (Fla.1977).

The majority argues in response that the Washington jury which acquitted the appellant of Currier's murder may have done so on the basis of a reasonable doubt as to whether Currier was killed in Washington or Idaho and thus acquitted because of that doubt. Further, the jury "could very well have believed that appellant had a connection with Currier's death, but that the state did not prove beyond a reasonable doubt that appellant was the actual murderer of Currier." And, finally, the majority says that "a verdict of acquittal in the previous case does not preclude all possibility of knowledge on the part of appellant of the [relevant] circumstances."[2] *Supra,* at 37. I contend that we need not and should not speculate as to the jury's basis of decision. The simple fact is that twelve men and women were asked to decide whether Scott Currier was murdered by Donald Paradis. They reached a unanimous decision that Paradis was "not guilty" of murdering Scott Currier. Because Donald Paradis was put once in jeopardy of this charge and succeeded in demonstrating his innocence to a jury of his peers, he should not have been forced to essentially redefend himself against that same murder charge in additional proceedings.

However, the majority also claims that "the evidence of Currier's death and its connection to appellant was not introduced for the primary purpose of showing the guilt of appellant regarding the death of Currier, but rather to explain to the jury a possible motive the appellant may have had to participate in the murder of Kimberly Palmer and to connect him with that murder." *Supra,* at p. 37. My rejoinder is essentially two-fold. First, it is obvious that the evidence in question could not be used to show appellant's guilt with regard

---

1. Because the majority assumes for purposes of its argument that it is in fact the same sovereign prosecuting in both cases, I too proceed on that assumption. However, I note in passing that the doctrine of dual sovereignty is inapplicable here and would in no way interfere with the application of collateral estoppel principles to the case at bar. As appellant correctly stated in his brief to this Court:

 "The dual sovereignty rule is based upon the principle that every citizen of the individual states or territories is also a citizen of the United States and thus owes 'allegience to two sovereigns, and may be liable to punishment for an infraction of the laws of either.' *Bartkus v. Illinois,* 359 U.S. 121, 31 [131], 79 S.Ct. 676 [682], 3 L.Ed.2d 684 (1959)."

 Appellant's Reply Brief, p. 4.

2. The Arizona Supreme Court was faced with a similar contention by the state in the case of *State v. Little,* 87 Ariz. 295, 350 P.2d 756 (1960). That case involved the admissibility of a prior narcotics charge for which the defendant was acquitted in a later narcotics prosecution on the rationale that these prior sales evidenced a common scheme or plan which encompassed the instant sale. The State argued that the verdict of acquittal meant only that the State had then failed to prove beyond a reasonable doubt *all* the elements of the prior offense and that, accordingly, the verdict does not necessarily disprove the fact of the prior sale, which is all that the State sought to prove for purposes of the later case. The Arizona Court responded as follows:

 "We do not agree, however, that the effect of the prior acquittal should be determined by a strict application of the rules of res judicata or collateral estoppel. Although a verdict of acquittal may not necessarily mean that the jury found that the prior sale did not in fact take place, such a finding is a possible and indeed reasonable inference to be drawn from the verdict. Further, the relevance of the alleged prior sale as part of a plan or scheme may be doubted in the absence of proof of criminality of that prior sale. *Thus, if the acquittal is based on an implied finding that the product sold was not sufficiently proved to be a narcotic or that defendant did not know that it was such, the sale could not reasonably be part of a plan knowingly to sell narcotics unless the jury in the instant action is permitted to find, contrary to the finding of the jury in the first action, that the defendant illegally and knowingly sold what was in fact a narcotic.*"

 *State v. Little,* 87 Ariz. 295, 305, 350 P.2d 756, 762 (1960) (emphasis added).

 I agree with this reasoning and find it to be especially relevant in the present circumstance, where the majority has likewise relied on a "common scheme" rationale to justify admission of the prior charge.

to the Currier murder—appellant had just been acquitted of that crime, and even the majority must agree that the double jeopardy clause precludes *actually* retrying a person for the same crime.[3] Thus, the majority's reasoning that the evidence of appellant's complicity in the Currier murder is not meant to actually show appellant's guilt is tautological and in fact proves too much because it will always be true. The prosecution will always want such evidence for some other reason than to prove the defendant's guilt—either for proof of motive, intent, a common scheme or plan, or even to provide, as Judge Haman said in this case, a "rational and cohesive scenario." Such "primary" use of the evidence is precisely what was considered and rejected in *Wingate* and *Blackburn.* It should have been rejected in this case as well.

Second, if it is indeed true that the prosecution was not attempting to show that Paradis in fact murdered Currier, I wholly fail to comprehend the relevance of photographs depicting Currier's mutilated corpse and other evidence relating not to the murder of Kimberly Palmer, but to the murder of Scott Currier.[4] In view of prosecution witnesses referring to Currier as "the victim," the jury is certainly to be forgiven if it became confused as to precisely for which crime they were trying Donald Paradis. Even assuming, *arguendo,* that some modicum of truth existed in the conclusion of the trial court that evidence of the Currier murder was necessary to provide for the jury a "rational and cohesive scenario," was it absolutely necessary to parade be-

fore the jury all the gory details of a murder for which the appellant had been acquitted? In my view, the trial court could clearly have satisfied any such need to portray a rational and cohesive scenario by permitting the State to show the *fact* of Scott Currier's death and of his relationship with Kimberly Palmer, while at the same time excluding the lurid details of the event.[5] *See State v. Sharp,* 101 Idaho 498, 515, 616 P.2d 1034, 1051 (1980) (Bistline, J., dissenting). Truly, the effect of the accumulated testimony concerning Scott Currier's murder was to seriously prejudice the appellant and force him to "run the gauntlet a second time," *Ashe, supra,* by again refuting evidence of a crime for which he had already been acquitted.

Even if this Court were not prepared to adopt the view that notions of collateral estoppel are sufficient to bar evidence of prior criminal charges for which a defendant has been acquitted, the Court, nevertheless, could and should have held the probative value of such evidence to be outweighed by the prejudice it created for the appellant. Previous Idaho case law in this area has extended the rule of *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979) to evidence "of other crimes for which [defendants] *have not been charged."* *State v. Izatt,* 96 Idaho 667, 534 P.2d 1107 (1975) (emphasis added). *See State v. Crawford,* 99 Idaho 87, 577 P.2d 1135 (1978). But, before today it has never been the law in Idaho that evidence of prior *acquitted* criminal charges are admissible on any of the justifications in *Needs.* In this case,

---

**3.** The only surprising thing about the majority's pat response is that by stating that it was not the prosecution's *primary* purpose to show the appellant's guilt in the Currier murder, it would seem to imply that such was perhaps a *secondary* purpose—a rather startling admission.

**4.** I have myself reviewed the ·photographs of Currier received into evidence against the appellant while on trial for the murder of Kimberly Ann Palmer. Although I have carefully considered including them as an attachment hereto, I have decided that the purpose served thereby—depicting better than any words the gore and butchery of Scott Currier's murder—is outweighed by a sensitivity which tells me that

such should not be published. They are not photographs of the average murder victim.

**5.** We note, in this respect, that the record clearly shows that the appellant offered to stipulate as to the fact of Currier's murder. What the defendant objected to throughout the trial, as defense counsel reiterated in oral argument, was the introduction of the "rather gruesome and graphic photographs and pieces of evidence from Dr. Brady," a forensic pathologist and the State Medical Examiner for Oregon. The prosecution, however, refused on the basis that it had to have introduced all of the evidence.

the defendant had been charged—and acquitted. I regret the Court's unfortunate decision to further extend the *Needs* rule to evidence of crimes for which the defendant has been acquitted as well as not charged, and would hold such evidence to be inadmissible.

The majority cites 86 A.L.R.2d 1132 for the proposition that "evidence of a prior acquitted crime is generally allowed if it falls within one of the recognized exceptions." *Supra*, at 36. However, the comments of that annotation's author are instructive in this context. After noting that, indeed, "the numerical weight of authority" had adopted the rule cited by the majority, the author states the following:

"On the other hand, a few authorities take the view that, as a general proposition, evidence as to another offense of which the defendant was acquitted is not admissible. This view rests primarily on the persuasive ground that defendant's acquittal of an offense should relieve him from having to answer again, at the price of conviction for that offense or another, evidence which amounts to a charge of a crime of which he has been acquitted.

"In view of the fact that some of the courts which follow the rule under which, notwithstanding defendant's acquittal of another offense, evidence of the facts which were the basis of the prosecution is admissible concede that upon his introducing the record of acquittal, that record is to be regarded as a conclusive adjudication that the defendant did not commit the other offense, and that the jury should be so instructed, *it seems preferable not to submit to the jury the facts regarding the other offense, since the impression, unfavorable to the defendant, resulting from his former arrest and the charge of crime at an earlier occasion never can be erased from the mind of the jury.*"

86 A.L.R.2d 1132, 1135 (1962) (emphasis added).

In addition, however, there *is* ample authority for the proposition that evidence of prior acquitted crimes should be excluded as involving undue prejudice to the defendant. *State v. Little*, 87 Ariz. 295, 350 P.2d 756 (1960); *Asher v. Commonwealth*, 324 S.W.2d 824 (Ky.1959); *McDowell v. State*, 142 Tex.Cr.R. 530, 155 S.W.2d 377 (1941); *People v. Milano*, 59 App.Div.2d 852, 399 N.Y.S.2d 226 (1977); *United States v. Gurney*, 418 F.Supp. 1265 (D.C.Fla.1976); *People v. Ulrich*, 30 Ill.2d 94, 195 N.E.2d 180 (1963); *People v. Corbeil*, 77 Mich.App. 691, 259 N.W.2d 193 (1977); *State v. Kerwin*, 133 Vt. 391, 340 A.2d 45 (1975); *People v. Atkins*, 96 Mich.App. 672, 293 N.W.2d 671 (1980); *Stuart v. State*, 561 S.W.2d 181 (Tex.Cr.App.1978); *People v. Bouton*, 50 N.Y.2d 130, 428 N.Y.S.2d 218, 405 N.E.2d 699 (1980); *State v. Naranjo*, 94 N.M. 407, 611 P.2d 1101 (1980); *State v. Anonymous*, 34 Conn.Sup. 689, 389 A.2d 1270 (1978). The majority states, in justifying the admissibility of the evidence concerning the Currier murder, that "regardless of his guilt or innocence in Currier's death, the evidence of that death is still highly relevant in showing a possible motive for appellant's involvement in Palmer's murder." *Supra*, at 37. However, in a similar case involving the trial court's admission of a prior criminal charge for which the defendant was acquitted on the basis that it evidenced a common scheme or plan encompassing the present criminal charge, the Arizona Supreme Court stated the following:

"The theory is that evidence, though inadmissible for one purpose, may be admitted if relevant for a different purpose. We are unable to subscribe to this formulation as it applies to the instant situation. We agree with the recognized exceptions to the general rule excluding evidence of former offenses, because that evidence is relevant, other than as proof of the character of the defendant, and because we believe that the need for and desirability of such evidence outweigh any prejudice to the defendant. *Relevancy is thus not the sole test of the admissibility of evidence; admissibility depends, rather, on a balancing of the various effects of the admission of such evidence,* considered in the light

of recognized rules of law governing the administration of criminal justice.

"The fact of an acquittal, we feel, when added to the tendency of such evidence to prove the defendant's bad character and criminal propensities, lowers the scale to the side of inadmissibility of such evidence."

*State v. Little*, 87 Ariz. 295, 350 P.2d 756 (1960) (emphasis added).

I, too, would hold such evidence, though perhaps relevant, to be overly prejudicial and thus inadmissible.

In Idaho, the rule is clearly that "[t]he probative value of the evidence linking the defendant to the commission of the crime is to be weighed against the prejudice to the defendant and the inclusion or exclusion of such evidence is a matter for the sound discretion of the trial court." *State v. Sharp*, 101 Idaho 498, 501, 616 P.2d 1034, 1037 (1980). In the present case, it is clear that both the introduction of evidence linking the appellant to the murder of Scott Currier, and the inflammatory nature of that evidence, were unnecessary to the prosecution's case and highly prejudicial to that of the appellant. I would therefore hold that the trial court abused its discretion in admitting such evidence and that appellant is entitled to a new trial free from the prejudice which to *any* rational mind was created against Paradis by introducing testimony and photographs identical to that which had been used to try Paradis in Washington for the murder of Scott Currier. There was simply no justification for the refusal of the prosecutor and the trial court in not accepting the stipulation into which Paradis' counsel offered to enter in lieu of the testimony and photographs which the prosecutor thereafter offered and the court admitted—thereby completely destroying Paradis' right to a fair trial.

## II.

### A.

I.C. § 19–2827(c)(1) directs this Court, with regard to a death sentence, that we shall determine whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. My best guess is that the drafter of this provision, perhaps really the original drafter from whom it was likely borrowed, forgot for the moment that the 1973 post-*Furman* legislature purported to remove sentencing as a jury function.[6] Irrespective of the validity of any conjecture in that regard, the provision is there, and this Court must accept that the clear intendment thereof is that the drafter, and in turn the enacting legislature, were fearful that sentencing judges were not beyond and above being influenced by passion or prejudice in sentencing a convicted first degree murderer. I have always thought otherwise, and in fact this provision points to a flaw in the sentencing which goes hand in hand with non-jury sentencing. If

---

6. "The Idaho Constitution, as first approved on July 3, 1890, an as it reads today, provides in Art. 1, § 7:

'Right to trial by jury.—The right of trial by jury shall remain inviolate ....'

That right of trial by jury as it existed at the time our constitution was adopted provided for jury participation in the capital sentencing process.

....

"At the time of *Furman*, I.C. § 18–4004 read: 'Punishment for murder.—Every person guilty of murder in the first degree shall suffer death or be punished by imprisonment in the state prison for life, and the jury may decide which punishment shall be inflicted. Every person guilty of murder in the second degree is punishable by imprisonment in the state prison not less than ten years and the imprisonment may extend to life.'

In its first post-*Furman* session (1973), the Idaho legislature deleted the jury function from I.C. § 18–4004 and made all convictions of first degree murder subject to the death penalty. This was done in an attempt to remove the 'cruel and unusual punishment' aspects disapproved in *Furman*."

....

"After the United States Supreme Court in a series of cases declared statutes of other states which were similar to Idaho's 1973 version unconstitutional, the Idaho legislature responded in 1977 with the present statutory scheme providing for inquiry into mitigating or aggravating circumstances as set forth in I.C. § 19–2515 et seq. That amendment changed the statute back to its pre-1973 language except that it omitted restoring the jury function ...."

*State v. Creech*, 105 Idaho 463, 477, 670 P.2d 463, 477 (1983)(Huntley, J., dissenting).

a jury imposed a sentence infected with passion or prejudice, who is the best positioned to know that it has happened? Is it five appellate judges some six to twelve months later on reading a cold record? Or is it the trial judge who, immediately and at the time the sentence is imposed, has fresh in his mind all of the evidence, all of the trial proceedings, and has personally observed the jurors and their reactions all through the trial and at oral summation? The answer is so self-evident as to not need the saying. But, under the present scheme the legislature's judgment is that five appellate judges on a voluminous cold record can deduce whether a sentencing judge has performed his function under the influence of passion, or of prejudice, or of both, or some other undefined "arbitrary factor." It is to expect too much that all members of a busy Court will painstakingly peruse those records and at the same time competently attend to other matters as well. Trial judges, historically, have been the first-hand arbiters who initially determine whether a jury's verdict at the guilt phase of a trial has been improperly tainted. Similarly, the jury should be the sentencer, and the trial judge, not this Court, should be the initial overseer.

### B.

Today we necessarily labor under the legislative philosophy that trial judges, as sentencers, may be arbitrary, and they may, while under the influence of passion or prejudice, impose sentences of death.

With that mind, although possessed of the highest regard for the sentencing judge in this case, I am brought to the conclusion that he may, as with many of us, have little or no regard for motorcycle gangs. I am brought to the conclusion that such is reflected in his refusing to accept the proffered stipulation, and forcing Paradis into a trial which could not be fair. I am brought to the conclusion that the photographs of the murdered Scott Currier, brought into this case where the charge was the murder of Kimberly Palmer, are so gruesome that the judge in all likelihood was himself affected thereby—even though perhaps not conscious that this was so. In all candor, I admit that had I been a juror in this case, the photographs of Scott Currier's body would have done far more than prove that he was dead, and that Paradis had a motive for killing Kimberly Palmer or having her killed. Had I been a sentencing judge, I do not believe that I could have ceased being a person at the same time, and would again concede that those photographs might very well have affected my judgment.

For these reasons, contrary to what I have previously stated in footnote 4, and mindful that my obligation as a member of this Court must outweigh any notions of sensitivity, I have concluded to append hereto a random sampling of the photographs. It is true that one picture has the worth of a thousand words. Here, indeed, words cannot adequately portray the inflammatory nature of the many photographs of the murdered Scott Currier.

HUNTLEY, Justice, dissenting.

This case presents a very difficult dilemma for an appellate court, in that the facts tend to indicate that the defendant committed a horrible crime in a manner which fully entitles him to suffer the death penalty.

However, the trial was conducted in a manner which violates all reasonable concepts of due process and, by permitting the decision to stand, the majority is doing great violence to the procedural protection to which our citizens are entitled, in order to sustain a result in one case.

However costly and inconvenient it might be, I would think it better that we remand this case for a new and proper trial rather than to permit the prostitution of those safeguards of individual liberties which make it possible for this democracy to function.

I join the dissent of Justice Bistline, and in addition I remain of the opinion that the Idaho capital sentencing process is unconstitutional in two respects, both of which could be readily corrected by rather simple legislative amendment:

**134**

(1) It does not provide for utilization of the jury, which violates both the Idaho and United States constitutions; and

(2) The sentencing proceeding, as conducted by the trial courts with the approval of this court, deprives the accused of the right to cross-examine and confront witnesses at the sentencing hearing and permits the admission of the presentence investigation report and other hearsay evidence.

My reasoning in this regard is set forth in detail in my dissenting opinions in *State of Idaho v. Creech*, 105 Idaho 463, 670 P.2d 463 (1983), and *State of Idaho v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983).